UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF INDIANA, ex rel. DOE I, DOE II, and DOE III,<br><br>        Plaintiffs,<br><br> vs.<br><br>SELECT MEDICAL CORPORATION and SELECT SPECIALTY HOSPITAL– EVANSVILLE, EVANSVILLE PHYSICIAN INVESTMENT CORPORATION; DR RICHARD SLOAN; DR. JEFFREY SELBY,<br><br>        Defendants. | Case No.  3 : 12 - cv - 51 RLY-WGH<br><br><br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |

<u>COVER SHEET PURSUANT TO U.S. DISTRICT COURT - S.D. LOCAL RULE 5.3(c)</u>

  The Relators, by counsel, Lane C. Siesky of Siesky Law Firm, PC and pursuant to Local Rule 5.3(c), provide this Court with a cover sheet for keeping the Amended Complaint under seal.

**APPROPRIATE TITLE BY WHICH THE DOCUMENT
MAY BE IDENTIFIED ON THE PUBLIC DOCKET**

  1.  "Sealed Pleading"

**STATUTES AND OTHER AUTHORITY FOR FILING OF PLEADING UNDER SEAL**

  2.  The Amended Complaint is brought under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq*. and pursuant to 31 U.S.C. § 3730(b)(2), the Amended Complaint should remain under seal for at least sixty (60) days or until the Government has

AMENDED COMPLAINT

made its election with respect to Intervention.

3.      The Amended Complaint is also brought pursuant to the Indiana False Claims Act, I.C. §5-11-5.5-4(c)(2).  As such, the Amended Complaint should remain under seal for at least one hundred and twenty days (120) days or until the Government has made its election with respect to Intervention.

4.      The Court's order to seal case, dated April 19, 2012.

**NAME, ADDRESS AND TELEPHONE NUMBER
OF THE PERSON FILING DOCUMENT**

5.                Lane C. Siesky, Attorney No. 21094-53
Siesky Law Firm, PC
4424 Vogel Road, Suite 305
Evansville, IN  47715
Telephone:  (812) 402-7700
lane@sieskylaw.com
ATTORNEY FOR RELATORS

{00016722; 1}

AMENDED COMPLAINT

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| [UNDER SEAL], | Case No.  3:12-cv-51 RLY WGH |
| Plaintiff, | AMENDED COMPLAINT |
| v. | |
| [UNDER SEAL], | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)** |
| Defendants. | |

**DOCUMENT TO BE KEPT UNDER SEAL**

- 1 -
AMENDED COMPLAINT

Plaintiffs-Relators Doe I, Doe II, and Doe III, through their attorneys, on behalf of the United States of America (the "Government," or the "Federal Government") and the State of Indiana, for their Complaint against defendants Select Medical Corporation, Select Specialty Hospital – Evansville, Inc., Evansville Physician Investment Corporation (EPIC), Dr. Richard Sloan, and Dr. Jeffrey Selby (collectively "Defendants"), allege, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.    <u>INTRODUCTION</u>

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Indiana arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or their agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("the FCA") and the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

2.      Select Medical is the owner and operator of 111 Long Term Acute Care Hospitals in 28 states including Select Specialty Hospital of Evansville, Indiana.

3.      Select Specialty Hospital in Evansville is a free standing 60-bed Long Term Acute Care Hospital in Evansville, Indiana.

4.      Select Specialty Hospital is a joint venture between Select Medical and Evansville Physician Investment Corporation (EPIC), a physician management corporation.  Select Medical owns 51% of the Select Specialty Hospital in Evansville and EPIC owns 49%.  The sole purpose of EPIC is for physician ownership of the Select Specialty Hospital in Evansville.

5.      All three Relators are long term employees of Select Medical and Select Specialty Hospital in Evansville.

6.      Relator Doe I is the Chief Executive Officer of the Evansville Select Specialty Hospital.  Relator Doe I currently reports to Kerry McLane, Regional President.   Before his

promotion to President of Hospital Division, Relator Doe I reported to Joe Gordon, then-President, L-TACH Division.

7.      Joe Gordon reports to Patricia Rice, the Chief Operating Officer of Select Medical.

8.      Relators Doe II and Doe III are long-term Case Managers at Select Specialty Hospital.

9.      Dr. Richard Sloan is a nephrologist and the Chief Medical Officer at Select Specialty Hospital in Evansville.

10.     Dr. Jeffrey Selby is a pulmonologist and provides pulmonary coverage at Select Specialty Hospital in Evansville.

11.     This action is brought to redress a pattern and practice of fraudulent abuse of the Medicare and Medicaid programs by Defendants resulting in the submission of false or fraudulent claims to the federal health care programs and most especially Medicare.

12.     These abusive and illegal practices include, most significantly, the knowing manipulation of Length of Stay for patients at Select Long Term Acute Care Hospitals to maximize reimbursement under the Medicare Prospective Payment System for Select and for referring physicians, unnecessary medical procedures and upcoding.  These decisions to maximize profit are often made contrary to the interests of patient health and safety and contrary to the express wishes of patients and their families.

13.     Abusive and illegal practices include holding patients at Select beyond what would be appropriate for the patients' medical care to obtain the LTACH Diagnostic Related Group (DRG) payment; forcing patients to leave Select prematurely once the DRG payment has been earned so as to avoid incurring more expense for that patient and to maintain an optimal profit margin; causing patients to be discharged to Acute Care Hospitals and then readmitted to Select after nine days timed to earn maximum revenue under the DRG even if not medically

appropriate for the patient; upcoding claims to higher DRGs than warranted; upcoding claims by adding telemetry procedures to a high number of patient claims; and admitting patients who are not proper for admission to LTACHs even where step-down care would be a more appropriate level of care.

14. Defendant Dr. Richard Sloan substantially controls the practices of discharge and admission for the majority of patients at Select Specialty Hospital in Evansville. Dr. Sloan manages each patient "to the date" meaning the optimal date for reimbursement for Select under Medicare's PPS system for LTACHs even when this is not in the patient's best interests for medical care.

15. Defendant Dr. Jeffrey Selby performs unnecessary bronchoscopies on many patients as a means of increasing reimbursement for himself and as an adjunct to Dr. Sloan's management of the Select's LTACH patients. Nursing staff and case workers at Select have noted that Dr. Selby uses Select patients as his "own personal ATM machine."

16. Select corporate managers have been informed and well aware of Dr. Sloan's and Dr. Selby's practices since at least 2007 but have knowingly allowed these physicians to manipulate length of stay and treatment decisions to maximize reimbursement as described herein. In fact, rather than curtailing these physicians, Select has rewarded at least Dr. Sloan with a lucrative medical directorship payment.

17. Misconduct at Select Specialty Hospital is not caused by the rogue action of unethical physicians alone.

18. As a matter of corporate policy, Select Medical trains its case managers and all employees to manage patients by a sole and unrelenting focus on maximizing payment under the DRG and setting Length of Stay as needed to obtain maximum reimbursement from Medicare without regard for patient health and safety.



19.     Select Medical trains each of its case managers to manage patients' Length of Stay based on financial criteria above all else.  Pat Rice, Chief Operating Officer, instructs case managers to avoid Short Stay Outliers by not allowing patients to be discharged to rehabilitation even where that would be better for the patient

20.     Select Medical reviews the performance of its case managers based strictly on financial goals: maintaining census (leading to many improper admissions), avoiding Short Stay Outliers (leading to holding patients when ready for discharge), discharging or transferring patient to other care setting once financial objective achieved and the patient becomes a "Medicare exhaust" (even if not in patient's interest), and readmitting patients after nine day interrupted stays.

21.     Case managers are trained in Mechanicsburg, Pennsylvania, when first hired on all of Select's techniques for "outlier management" including "Managing Length of Stay; tips to being successful.  Case managers who do not meet their financial objectives are sent to a remedial education program where the importance of increasing census and managing length of stay are also emphasized.

22.     Case managers are trained to manage each patient each day according to a financial "Operational Cumulative DRG Report" referred to internally as "the Bible."  The database for this and all reporting is maintained on a server in Pennsylvania through Select's proprietary HMS system.

23.     Case managers are trained to work with physicians by giving them the DRG information and working with families either to promote that the patient should leave sooner once they become a Medicare exhaust or requires additional treatment if they might be a Short Stay Outlier.

24.     Select Medical also pays its Directors of Marketing on a commission basis rewarding them for high rates of patient admission and recruitment during the year.

- 5 -

25.     Select Medical actively targets respiratory patients on vents from acute hospitals ICUs for transfer to the LTACH.  Respiratory patients on vents qualify for DRG 207 which pays $74,000.  By weaning the patient off the vent timed to maximize payment, the hospital can make a substantial margin on a vent patient.

26.     Select actively markets to acute care facilities to "send us your vent patients" also because DRG 207 allows for a 28/29 day LOS.  That way the LTACs can earn high margins on each vent patient plus they can meet the Medicare requirement that they keep patients for an average LOS of at least 25 days.

27.     Select Medical also trains its case managers to coach physicians on how to document patient's conditions in their History and Physical so as to move patients to a higher weighted DRG.  One coaching sheet created by Select Medical for case managers to give to physicians coaches them by saying "it takes just one CC diagnosis to move a patient from a DRG described as 'without CC' to a DRG 'with CC.'"  Case managers are trained to actively lead physicians by saying "would you please clarify whether this patient has mild, moderate or severe malnutrition" and giving them the language needed to code for a higher DRG.

28.     Select Medical trains its case managers that if a patient is getting close to discharge as a Short Stay Outlier, one should put them on occupational or physical therapy at the LTACH and not transfer to rehabilitation.  Pat Rice, and a Senior Case Manager from Nashville, Debra York, instruct other Case Managers never to release a patient as a Short Stay Outlier if there is some kind of service that can be provided to them within the LTACH.

29.     Select recruits and rewards physicians willing to manage patients with the primary goal of maximizing DRG reimbursement even at the cost of patient health and safety.

30.     Select systematically and repeatedly turns a blind eye to well-documented abuses in its Long Term Acute Care Hospitals.

31.     In Evansville, Select has threatened to terminate employees who have challenged its practices or physicians.  Relators have been threatened with termination, demotion and out of state transfer for attempting to prevent Dr. Sloan from endangering patients through reckless decisions over admission, treatment, discharge and readmission.

32.     Physicians, managers and employees at Select Specialty have repeatedly and insistently warned Select corporate managers including Joe Gordon, President Hospital Division and Pat Rice, Chief Operating Officer of Select Medical, of the abuses at the Evansville hospital but have been unable to obtain effective corporate intervention or enforcement of compliance action plans to stop these practices.

33.     Claims submitted to Medicare and Medicaid for patients whose stay at Select has been lengthened to obtain a DRG payment are false or fraudulent claims.

34.     Claims submitted to Medicare and Medicaid for patients whose stay at Select knowingly was shortened to maximize reimbursement under a DRG are false or fraudulent claims.

35.     Claims submitted to Medicare and Medicaid for patients whose admission at Select (and discharge and subsequent readmission) knowingly were manipulated to ensure maximum revenues for defendants rather than appropriate patient care, are false or fraudulent claims.

36.     Claims submitted to Medicare and Medicaid for patients who knowingly were admitted to Select but would have been better suited for step-down, less expensive care, are false or fraudulent claims.

37.     Select also knowingly permits physicians to upcode diagnoses to maximize reimbursement.  Most typically, patients with some respiratory distress will be upcoded to "acute respiratory failure."  Complications and co morbidities are added to the coding without regard to patient status or medical records including severe malnutrition.

38.     Claims submitted to Medicare and Medicaid for patients whose diagnoses has been upcoded to justify a higher cost DRG without foundation in the medical record, are false or fraudulent claims.

39.     Claims submitted to Medicare and Medicaid for patients whose claims have had unnecessary telemetry added are false or fraudulent claims.

40.     Select also has knowingly submitted claims for unnecessary bronchoscopies performed by Dr. Jeffrey Selby at Select Hospital in Evansville.

41.     Select also fails to alert patients about the financial relationships between EPIC and Sloan and Select.

42.     Relators have repeatedly sought to stop the practices at the Select Specialty Hospital – Evansville by alerting Select Medical corporate managers, Select's compliance officer, and corporate agents including Joe Gordon and Pat Rice and Select's National Medical Director Dr. David Jarvis.

43.     Select Medical, acting through its agents, has consistently failed to stop the practices in Evansville.

44.     Select has failed to stop the abuses in Evansville because the practices are consistent with corporate policy for increasing revenues and profits at the expense of the federal health care programs and patient health and safety.

45.     Defendants have submitted numerous false claims to federal health care programs for medically unnecessary procedures, diagnoses miscoded and upcoded to earn a higher DRG, and services of a quality that do not meet professional standards of care.  Each submission is a false or fraudulent claim in violation of the False Claims Act.

46.     The FCA was enacted during the Civil War, and was substantially amended in 1986 and 2009.  Congress amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in

{00011690; 1}
AMENDED COMPLAINT

federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.   The amendments created incentives for individuals to come forward with information about fraud against the government without fear of reprisals or Government inaction, and enable the use of private legal resources to prosecute fraud claims on the Government's behalf.

47.     The FCA provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.  31 U.S.C. § 3729(a)(1)(G) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461 note; Public Law 104-410]).

48.     The FCA allows any person having information about a false or fraudulent claim against the Government to bring an action for himself and the Government, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

49.     Indiana has enacted a law similar to the FCA to enable them to recover for fraud affecting Indiana programs.  Relators allege that the Defendants' conduct violates the FCA and the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

50.     Based on the foregoing laws, qui tam plaintiffs Doe I, Doe II, and Doe III seek, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in connection with provision of medical services to patients at Select Specialty Hospital in Evansville.

51.     Relators also seek to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in

connection with provision of medical services to patients at Select Medical's other LTACH hospitals throughout the United States.

## II.    PARTIES

52.    Plaintiff-Relator Doe I is the Chief Executive Officer of Select Specialty Hospital in Evansville and has been with Select for over thirteen years.   Relator Doe I has been threatened with demotion and transfer for raising concerns about fraud and abuse by Drs. Sloan and Selby and by Select Medical.

53.    Plaintiff-Relator Doe II has been a Case Manager at Select Specialty Hospital in Evansville for over thirteen years and most recently became a Lead Case Manager.

54.    Plaintiff-Relator Doe III worked at Select Specialty in different capacities over fifteen years.  Relator Doe III is a Registered Nurse and was, at different times, the Director of Marketing, the Director of Case Management at Select Specialty and the Director of Clinical Services.  Since late 2011, Relator Doe III has worked at Select only on a per diem basis after suffering retaliation from Select Medical and Dr. Sloan for reporting internally Doe III's concerns with management of patients and fraud and abuse issues.

55.    Defendant Select Medical is a leading provider of specialized medical services in the inpatient and outpatient settings.  In the inpatient setting, Select is the owner and operator of 111 Long Term Acute Care Hospitals in 28 states.

56.    LTACH patients are typically admitted from general acute-care hospitals and have specialized needs and often complex and serious medical conditions.  These patients generally require a longer length of stay than typical in a general acute care hospital.  An average LTACH stay is 25 days or longer

57.    Select Medical is a Delaware corporation and its corporate headquarters are in Mechanicsburg, Pennsylvania.

{00011690; 1}                                AMENDED COMPLAINT

58.     Select Medical was co-founded in 1996 by Rocco Ortenzio and Robert Ortenzio. Its parent company is Select Medical Holdings Corporation, which is listed on the New York Stock Exchange as SEM.

59.     Defendant Select Specialty Hospital in Evansville is a 60 bed Long Term Acute Care Hospital in a free standing facility.

60.     Defendant Dr. Richard Sloan is a nephrologist practicing in Evansville, Indiana. Dr. Sloan holds privileges at both St. Mary's and Deaconess Hospitals.  He has been the Chief Medical Officer of Select Specialty Hospital since August 2009.

61.     Defendant Dr. Jeffrey Selby is a pulmonologist practicing in Evansville, Indiana. He provides pulmonary services coverage to Select Specialty Hospital in Evansville.

## III.    JURISDICTION AND VENUE

62.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  In addition, 31 U.S.C. § 3732(b) vests this Court with jurisdiction over the state law claims asserted in this Complaint.  Under 31 U.S.C. § 3730(e) and the Indiana False Claims and Whistleblower Act, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.   Even if there has been any such public disclosure, Relators are the original sources of the allegations herein.  Relators voluntarily disclosed the complaint to the United States and the State of Indiana before filing and they have provided the United States and the States with additional material information in support of the allegations.

63.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found to have transacted business in the Southern District of Indiana.



- 11 -

64.     Venue is proper in the Southern District of Indiana pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this district.  At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district and/or maintained employees and offices in this district.

## IV.   APPLICABLE LAW

### A.   Medicare

65.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease.

66.     The Medicare Program has four parts: Part A, Part B, Part C and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider.

67.     The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

68.     Medicare coverage is limited to those items and services which are reasonable and medically necessary.  42 U.S.C. §1395y(a)(1).  Health care practitioners and providers are required to ensure that all services are "provided economically and only when, and to the extent, medically necessary."  42 U.S.C. §1320c-5(a)(1),(3).  Providers who furnish services or items substantially in excess of the needs of their patients may be excluded from participation in federal health care programs altogether.  42 U.S.C. §1320a-7(b)(6).

69.     Participating providers are also required to ensure that all services are "of a quality that meets professionally recognized standards of care."  42 U.S.C. §1320c-5(a)(2).

70.     Under Medicare Part B, "Medicare carriers" are responsible for accepting and paying claims for certain reimbursements under Medicare Part B.

71.     Under Part B, the physician typically submits a bill using Form CMS-1500.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient."

72.     In addition, each provider must sign a provider agreement as a condition of participation that agrees to comply with all Medicare requirements including the fraud and abuse provisions.  A provider who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.  By submitting a claim for Medicare reimbursement, the provider certifies that the submitted claim is eligible for Medicare reimbursement and that the provider is in compliance with all Medicare requirements

**B.     Medicaid and TRICARE/CHAMPUS**

73.     Medicaid is a public assistance program providing for payment of medical expenses for low-income and disabled patients.   Funding for Medicaid is shared between the Federal Government and those states participating in the program.

74.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.

75.     Each physician that participates in the Medicaid program must sign a Medical provider agreement with his or her state.  The State of Indiana requires any prospective Medicaid provider to certify that he or she will comply with all of the Department's Medicaid requirements, which incorporate the Federal fraud and abuse provisions.

76.     The Indiana Medicaid State Plan also limits coverage to medically necessary procedures. In Indiana, Medicaid services are provided to members through multiple delivery

{00011690; 1}     AMENDED COMPLAINT

systems. To participate in the program, providers must enroll with the Indiana Health Coverage

Programs (IHCP). The Indiana Medicaid program reimburses only those services that are

"medically reasonable and necessary." 405 Ind. Admin. Code 5-2-17 (2012).  A medically

reasonable and necessary service is a covered service that is required for the care and well being

of the patient and is provided in accordance with generally accepted standards of medical or

professional practice. *Id.* The Medicaid program will not reimburse non-covered services or

services otherwise excluded from coverage. *Id.*

      77.      For in- and outpatient services, the billing instructions for the Medicaid program

specifically provide that IHCP providers may only bill for services that are "medically necessary

for the diagnosis or treatment of the member's condition." IHCP Provider Manual, Chapter 8:

Billing Instruction 8-79, 8-102. In the Provider Enrollment application for participation in

Indiana's Medicaid program, providers must certify that he or she will submit claims that can be

documented as being strictly for "medically necessary medical assistance services." IHCP

Provider Agreement. Compliance with the terms of the Agreement is a condition of payment

under the Indiana Medicaid program. *Id*

      78.      Each physician that participates in the Medicaid program must sign a Medical

provider agreement with his or her state.  The State of Indiana's Medicaid Provider Agreement

requires any prospective Medicaid provider to certify that he or she will comply with all of the

Department's Medicaid requirements, which incorporate the Federal fraud and abuse provisions.

      **C.**      **Prospective Payment System for Long Term Acute Care Hospitals**

      79.      Since 2002, the Medicare payment system for Long Term Acute Care Hospitals

is based on a prospective payment system referred to as LTACH-PPS.

      80.      Under LTACH-PPS "[f]or each discharge, a long-term care hospital's Federal

prospective payment is computed on the basis of the Federal prospective payment rate

- 14 -

multiplied by the relative weight of the LTC-DRG assigned for that discharge." 42 C.F.R.

412.523)

81.     The LTACH will be paid a pre-determined fixed amount applicable to the

assigned 510 LTACH-DRGs (adjusted for area wage differentials).

82.     The payment amount for each LTACH-DRG is intended to reflect the average cost

of treating a Medicare patient assigned to that LTACH-DRG in a long term acute care hospital.

83.     LTACH-PPS also includes special payment policies that adjust the payments for

some patients based on the patient's length of stay, the facility's costs, whether the patient was

discharged and readmitted and other factors.

84.     In the LTACH PPS there is a financial penalty for treating patients "too quickly."

Patients who are discharged with an LOS less than 5/6 of the historical geometric mean LOS for

that DRG receive a payment that is almost always lower than the DRG payment.  The policy

intent is to prevent LTAC hospitals from providing a level of care commensurate with acute care

hospitals, yet receive the higher LTACH reimbursement levels.

85.     If a patient is discharged before the number of days required to earn the LTAC-

DRG, it can be considered a Short Stay Outlier.  SSO payments occur when the covered length of

stay is less than 5/6 of the anticipated Length of Stay for the LTAC-DRG.  42 C.F.R. §412.529.

These payments are based on a formula but are less than the LTAC-DRG otherwise assigned to

the patient.

86.     LTACs earn a greater payment if patients are kept long enough to meet the 5/6

goal date.

{00011690; 1}

87.     LTACH-PPS regulated payments for patients who are discharged by readmitted to the LTAC.  Under this "interrupted stay" regulation, patients discharged from the LTACH to home, hospital, skilled nursing facility, etc. and who are subsequently readmitted to the same LTACH prior to a threshold number of days will not receive an additional LTACH DRG payment.  This regulation is intended to prevent discharge prior to the patient's clinical readiness and to prevent patients from being transferred between provider sites for the purpose of achieving additional reimbursement.  42 CFR §412.531.

88.     There are two types of "interrupted of stays:" Less than 3 Days and Greater than 3 Days.

89.     A "Less Than 3 Day Interruption" is when a patient leaves the LTCH and goes to an acute care hospital, an IRF, or SNF and then returns to the LTCH in 3 days.  Despite the interruption, Medicare will only make one LTC-DRG payment—the return to LTCH after the interruption does not count as a new admission.

90.     A "Greater Than 3 Day Interruption" is when a patient leaves the LTCH and goes to an acute care hospital, an IRF, or SNF, and then returns AFTER 3 days but BEFORE the "fixed day period" associated with the other facility.  An acute care hospital has a fixed day period of 4-9 days; an IRF's is 4-27 days; and a SNF's is 4-45 days.  If a patient returns to the LTCH during the fixed day period, Medicare will only make one LTC-DRG payment.

91.     Medicare will only make two separate LTAC-DRG prospective payments when the patient is discharged from the LTCH and stays at the acute care hospital for more than 9 days or at an IRF for more than 27 days or at a SNF for more than 45 days.

92.     The "nine day period" for transfer from a LTAC to an acute care hospital is referred to as the "interrupted stay threshold."

93.     As discussed herein, Defendants here manipulate patient status after discharge to an acute care hospital (when possible) so that over 9 (nine) days elapses before the patient is re-admitted back to the LTACH.  Upon readmission, Defendants are paid double the DRG reimbursement.  The closer the readmission is to nine (9) days the greater the chance that Defendants here will seek to delay the readmission.

94.     The purpose of the "interrupted stay threshold" is to "reduce the incentives inherent in a discharge-based prospective payment system of 'shifting' patients between Medicare-covered sites of care in order to maximize Medicare payments."  67 FR 55954

95.     Medicare, Medicaid and the other federal health care program require as a condition of coverage that services be reasonable and medically necessary.  42 U.S.C. § 1395y(a)(1)(A).

96.     Providers must provide economical medical services and, then, provide such services only where medically necessary.  42 U.S.C. § 1320c-(a)(1).

97.     Providers must provide evidence that the service is medically necessary as appropriate. 42 U.S.C. § 1320c-5(a)(3).

98.     Providers must ensure that services provided are not substantially in excess of the needs of such patients.  42 U.S.C. § 1320a-7(b)(6)&(8).

**D.     Medicare Cost Reports**

99.     Through the course of the fiscal year, LTACH hospitals submit claims to their assigned Fiscal Intermediaries (FI) for Medicare reimbursement.  Based on these Cost Reports,

- 17 -

the Fiscal Intermediary determines the correct amount of Medicare reimbursement for the cost year and either pays the hospital any additional amounts due or bills the hospitals for excess interim payments as appropriate.

100.    Every LTAC Hospital's Cost Report contains a "Certification" which must be signed by the chief administrator of the hospital or a responsible designee.  For the past years at issue in this case, the certification provision in the Cost Report required the responsible provider to certify, in pertinent part, that the facility is in compliance with all federal healthcare laws and regulations.

101.    Select submits Cost Reports each year expressly certifying that they were in compliance with all applicable laws and regulations. 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having an improper "financial relationship" (as defined in the statute) with the hospital.  The regulation implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353.

102.    The Stark Statute establishes that the providers should not submit claims for item or services referred by physicians who have improper financial relationships with the providers of the items or services.  In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.  Congress relied on various academic studies consistently showing that physicians who had financial relationships with medical service providers used more of those providers' services than similarly situated physicians who

did not have such relationships.  The statute was designated specifically to reduce the loss suffered by the Medicare Program due to such increased questionable utilization of services.

103.    Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider.  See Omnibus Budget Reconciliation Act of 1989, Pub. Law 101¬239, § 6204.

104.    In 1993, Congress amended the Stark Statute (Stark II) to cover referrals for ten additional designated health services.  See Omnibus Budget Reconciliation Act of 1993, Pub. Law 103-66, § 13562, Social Security Act Amendments of 1994, Pub. Law 103-432, § 152.

105.    As of January 1, 1995, Stark II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services"; (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics, orthotics and prosthetic devices and supplies:  (9) outpatient prescription drugs; and (10) home health services.  See 42 U.S.C. § 395nn(h)(6).

106.    In pertinent part, the Stark Statute provides:
    (a)    Prohibition of certain referrals

    (1)    In general Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2),then:

        A)    the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter; and

        B)    the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

- 19 -

42 U.S.C. § 1395nn(a)(1).

107.    The Stark Statute broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to a referring physician.  The statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions.

108.    An employment relationship may be considered proper under the Stark Statute, but only if the amount of the remuneration under the employment is consistent with the fair market value of the services, and is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician.

109.    Compensation paid to a referring physician serving as a consultant to a hospital may fall within an exception to the statute but only if the contract specifies the services covered, covers all the services to be provided by the physician, and the aggregate of such services is reasonable and necessary for the legitimate business purposes of the hospital and is consistent with fair market value for services actually rendered, not taking into account the volume or value of the referrals or other business generated between the parties.  42 U.S.C. § 1395nn(e)(3).  Thus, compensation paid to a physician (directly or indirectly) under a medical directorship that exceeds fair market value, or for which no actual services were required, triggers the referral and payment prohibitions of Stark II with respect to designated health services referred by that physician.

110.    Violations of Stark may subject the physician and the billing entity to exclusion from participation in federal health care programs and various financial penalties, including (a) a civil money penalty of $15,000 for each service included in a claim for which the entity knew or should have known the payment should not be made under section 1395nn(g)(1); and (b) an assessment of three times the amount claimed for a service rendered pursuant to a

referral the entity knows or should have known was prohibited.  See 42 U.S.C.

§§ 1395nn(g)(3), 1320a-7a(a).

111.    In sum, Stark prohibits hospitals from billing Medicare for certain designated

services referred by a physician with whom the hospital has a financial relationship of any type

not falling within specific statutory exemptions.  42 U.S.C. § 1395nn.  The statute specifically

prohibits hospitals from billing for such services.  In-patient and out-patient hospital services

are among the designated health services to which the Stark II referral and billing prohibitions

apply.

### i.    The Medicare and Medicaid Anti-Kickback Statute

112.    The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback statute),

42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977.  The Anti

Kickback Statute arose out of Congressional concern that payoffs to those who can influence

health care decisions will result in goods and services being provided that are medically

inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.

To protect the integrity of federal health care programs from these difficult to detect harms,

Congress enacted a prohibition against the payment of kickbacks in any form, regardless of

whether the particular kickback actually gives rise to over utilization or poor quality of care.

113.    The Anti-Kickback statute prohibits any person or entity from making or

accepting payment to induce or reward any person for referring, recommending or arranging

for the purchase of any item for which payment may be made under a federally-funded health

care program.  42 U.S.C. § 1320a-7b(b).  The Statute not only prohibits outright bribes and

rebate schemes, but also prohibits offering inducements or rewards that has as one of its

purposes inducement of a physician to refer patients for services that will be reimbursed by a

federal health care program.  The Statute ascribes liability to both sides of an impermissible

kickback relationship.

114.    The Anti-Kickback Statute contains statutory exceptions that exempt certain transactions from its prohibitions.  These exceptions include regulatory safe harbors for space rental, equipment rental, and personal services and management contracts as long as certain standards are met.  The space and equipment rental safe harbors apply to payments made to a lessor for the use of the premises or equipment as long as "the lease is intended to provide the lessee with access for periodic intervals of time" with schedules, intervals and costs expressly stated in the lease, the rental charge is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties. . . . 42 C.F.R. §§ 1001.952(b), (c).  Thus, where payments purportedly made to lease real property or equipment do not comply with the conditions and are made with the intent to reward referrals, the Anti-Kickback Statute has been violated.

115.    The personal services or management contracts safe harbor applies to payments to an agent as long as the agency agreement is intended to provide the services of the agent on a periodic, sporadic or part-time basis with schedules, intervals and costs expressly stated in the contract, the compensation is consistent with fair-market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties.  Id.  at § 1001.952(d).  When compensation is paid for personal or management services that are not provided and the compensation is made with the intent to induce referrals, there is a violation of the Anti-Kickback Statute.

116.    Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. §§ 1320a-7(b)(7), 1320a-7a(a)(7).

117.    Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMP VA, Federal Employee Health Benefit Program, and other federal health care programs.

118.    Either pursuant to provider agreements, claims forms, or other appropriate manner, hospitals, pharmacists and physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law.

119.    Any party convicted under the Anti-Kickback statute <u>must</u> be excluded (<u>i.e.</u>, not allowed to bill for services rendered) from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

120.    The enactment of these various provisions and amendments demonstrates Congress's commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the Stark and Anti-Kickback statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare and other federal health care programs.

## V.    ALLEGATIONS

121.    Select Medical has a long history of managing patients' admissions, Length of Stay, discharge and readmissions in its Long Term Acute Care Hospitals to maximize DRG reimbursement.

122.    Select Medical has also always managed its Long Term Acute Care Hospitals to maximize its census while ensuring as low as number of Short Stay Outliers as possible.

123.    LTACs are dependent on referrals by physicians of patients at acute care hospitals.  A LTAC patient typically should no longer be appropriate for inpatient admission in the acute care setting but also not be eligible for discharge to home or step-down care in a rehabilitation or nursing facility.

124.    Starting in 2005, Select Medical managers including Pat Rice and Joe Gordon became concerned that Select's Evansville hospital would have a declining census of patients. Select Specialty intended to transfer being a "hospital in a hospital" to being a stand-alone facility.

125.    At first, Select attempted to work out joint venture arrangements with the two Evansville acute care hospitals, St. Mary's and Deaconess.

126.    In late 2005, Dr. Sloan approached Select through Relator Doe I to inform Select that they would pull nephrology services unless Select considered some kind of limited ownership by the physicians.  In Sloan's words "Select should forget about the hospitals and offer the Docs ownership.  The Doctors are the ones that bring the patients, not the hospitals." Sloan requested that he speak directly with Pat Rice.

127.    Rice responded by say "the physicians are really in the act … this is the only nephrology group in town so without them we could not take patients on dialysis."

128.    To guarantee a steady referral base of physicians, Select, through Pat Rice, worked with Dr. Sloan to get physicians involved in partial ownership of Select so that the physicians would have a financial interest in referring patients to Select Specialty Hospital and, therefore, an interest in its financial success.

{00011690; 1}
AMENDED COMPLAINT

129.     Dr. Sloan formed the Evansville Physician Investment Corporation (EPIC) for the sole purpose of entering into a joint venture with Select Medical for co-ownership of the Select Specialty Hospital in Evansville.

130.      From the beginning, there has been discord in the relationship between Select and EPIC over financials with EPIC pushing for larger distributions and expense reductions. Dr. Sloan threatened to pull out his referrals in 2007 and has periodically made the same threats.

131.     In October 2007, Relator Doe I discussed concerns about Dr. Sloan's conduct with Joe Gordon.  They discussed how the-then current Medical Director, Dr. Browne, was distressed about the comments he heard from Dr. Sloan about managing patients to achieve the reimbursement possible by meeting the 5/6 date.  From that meeting, Relator Doe I emerged with a "to do" list of discussing with Dr. Sloan his comments about the 5/6 dates and concerns among the staff that Dr. Sloan should not prevent nurses and other staff from addressing address End Of Life issues with patients and their families.

132.     On July 5, 2007, former Director of Clinical Operations Fred Reinetz spoke with Relator Doe I about being very uncomfortable with how Dr. Sloan was inserting himself into the day-to-day operations of the hospital and checking on patient's 5/6 dates every morning and trying to manage the patients to the optimal DRG reimbursement date.

133.     Reinetz conveyed a number of specific concerns about Dr. Sloan.

134.     Sloan has forced house supervisors to open locked case managers' office during the night to obtain her 5/6 list of patients.

135.     Sloan had kept patients at Select for prolonged periods of time, delaying appropriate treatment, so that patients would meet the 5/6 date.  One patient needed to receive continuous renal replacement therapy (CRRT) but Sloan delayed her transfer for treatment to meet the 5/6 date.

{00011690; 1}                    AMENDED COMPLAINT

136.    Two other patients who would have been set for discharge but who had not met the 5/6 date and Sloan started a sodium bicarbonate drip on one and a TPN drip on the other leading to a change in status and keeping them as in patient until they hit their 5/6 dates.

137.    Sloan also instructed staff and the wound care nurses that they would need to obtain his approval before performing a debridement to ensure patients met their 5/6 dates.

138.    Staff members communicated that their impression was that Sloan and his partner Dr. D'Mello keep patients 4-6 days extra on average to achieve the 5/6 date.

139.    On July 9, 2007, Joe Gordon visited Evansville and met with Dr. Browne, Dr. Sloan and staff.  Apparently, Dr. Sloan acknowledged that he may have "stepped over the line" with some patients and that he would stop doing this conduct in the future.

140.    Nothing changed as a result of Doe I's discussions with Dr. Sloan and Joe Gordon took no further steps to address the issue.

141.    In 2009, Dr. Sloan and his partner Dr. D'Mello became angry at Select for refusing to treat them as hospitalists and allowing them to control all admissions and plans of care.

142.    As a result, Dr. Sloan refused to take all but a small fraction of admitted patients for January 2009.  Census fell and the second floor of the hospital had to be closed.  By April 2009, Medical Director of Specialty and Relator Doe I were in discussions with Select Medical about how to obtain physician coverage in nephrology and pulmonology.

143.    On June 30, 2009, Joe Gordon and Pat Rice paid a surprise visit to meet with Dr. Sloan, Dr. Gade and Relator Doe I.  During the meeting, they discussed that there was a dispute between family practice and nephrologists over who should be attending physicians and control admissions to Select Specialty Hospital.

144.    Dr. Sloan and Dr. D'Mello expressed their strong opinion that they should be paid to supervise admissions as hospitalists.

145.     Joe Gordon and Pat Rice instructed Relator Doe I that Doe I had to allow Dr. Sloan to be actively engaged in running the hospital for Select Specialty to be successful because Dr. Sloan controls a large referral base for patients.

146.     Gordon and Rice met privately with Dr. Sloan for a long time and afterward informed Relator Doe I that Select Medical would contract with Dr. Sloan to make him their Chief Medical Officer.

147.     Relator Doe I was visibly upset about this and voiced Doe I's concerns with allowing Dr. Sloan to control admissions and patient care but Gordon and Rice overrode Relator Doe I's concerns.

148.     Gordon and Rice visited Evansville again in July 2009 to continue negotiations with Drs. Sloan and D'Mello.

149.     On August 13, 2009, Relator Doe I had a telephone call with Joe Gordon where he laid out that the purpose of contracting with Sloan as a Chief Medical Officer was to get him back to being involved with Select Specialty on a daily basis.

150.     Gordon told Relator Doe I that he was upset with Doe I for Doe I's lack of responsiveness about establishing duties for Dr. Sloan as a Chief Medical Officer.

151.     Gordon emphasized that he wanted Sloan involved on a daily basis with the hospital.  The maximum for his administrative duties would be four hours per day under the CMO contract but they anticipated that Sloan would be very involved with admissions and as an attending physician again.

152.     Securing Dr. Sloan as Chief Medical Officer put him in a position to control admissions and put him in a position to manipulate length of stay for patients to maximize DRG reimbursement, code patients' for diagnoses purposes and determine care given patients.

153.     Admissions for Sloan to Select Specialty went from 181 admits in 2008 to 81 admits in 2009 and then up to 280 admits in 2010 and 184 admits in 2011.

154.    In 2009, Dr. Perkins wrote to Joe Gordon and Pat Rice expressing his strong concerns that Dr. Sloan's and his partner's interest in financial distributions from Select Medical was having a direct and negative effect on patient care.

155.    Dr. Perkins also raised the question whether Dr. Sloan's control of both referrals to Select and his control of admissions within Select, coding of the patients, and their length of stay raised serious concerns about "regulatory oversight" and "compliance."  No changes were made by Select.

156.    Throughout 2010, nurses and case managers and other staff continued to observe Sloan making treatment and planning decisions for patients in accordance with maximizing DRG reimbursement for Select rather than in accordance with the patients' needs. Incident reports were written and reported by nursing and other staff.

157.    Relators repeatedly expressed their concern for the safety and well being of the patients and changing patient status to achieve the 5/6 date.

158.    In August 2010, Relator Doe III spoke with Joe Gordon about Doe III's concerns of Sloan up-coding patients to ensure a higher DRG, changing a patient's DNR status to achieve the 5/6 date, and stopping by the offices of case managers before responding to a code to find out whether the patient in code status had met their Length of Stay for their DRG.

159.    After Gordon met with Relator Doe III, both Gordon and Relator Doe I spoke with Sloan regarding these concerns.  Rather than changing his conduct, Sloan continued to make remarks on the floor about patient's DNR status and needing to achieve the 5/6 date wanting a nurse fired because she spoke with the family regarding comfort measures.

160.    Staff came to Relator Doe I to complain about his inappropriate comments regarding the 5/6 date and not doing what is best for the patient.  Relator Doe I called Gordon again to report Sloan's ongoing behavior and Gordon responded in an email stating: "This is very serious.  Regardless of whether he believes he is doing anything wrong or regardless of

having good intensions, he needs to be very careful on what he communicates to people verbally or in writing.  It must be able to pass scrutiny by anyone from the outside.  If caught with a problem it could be devastating for us and the investors."

161.    In January 2011, Relator Doe I emailed the Census Assessment to Pat Rice and noted that Sloan was admitting over 50% of the patients to him as their attending physician and controlling their treatment decisions.  Doe I also mentions that staff members at local hospitals were questioning Select's high rates of transfers of patients back to acute care hospitals.  Doe I also notes that Selby (the remaining pulmonologist at Select) has a poor reputation in the community and is "impacting all pulmonary business based on outcomes."

162.    Through early 2011, Relators continued to document problems with Sloan's management of patients.  Two patients from May 2011 in particular were very troubling and caused Relator Doe III to take Doe III's concerns to Doe I and Corporate Compliance.

163.    On April 21, 2011, Relator Doe I wrote to Joe Gordon in Doe I's capacity as CEO for Select Specialty to report that Dr. Sloan's "actions have become more serious involving patient care and the staff is questioning the ethics of his decisions . . . I feel it places SSH-Evansville at risk for compliance.  My primary goal is to protect the hospital and to ensure that we provide quality care to the patients."

164.    In response, Gordon informed Doe I that he had spoken with Dr. Perkins but did not follow up substantively on Relator Doe I's request.

165.    On May 2, 2011, Relator Doe I reported further concerns to a representative from Corporate, Human Resources Department concerning reports from Case Managers that Dr. Sloan "practices medicine based on financial margins, not clinical decisions, everyone knows it."  Doe I also informed Kristy that Doe I had informed Gordon of comments made by Dr. Sloan in stopping to check a patient's Length of Stay before responding to a code called on

the patient.  Gordon had told Relator Doe I not to fax the records concerning this incident to him.  Kristy told Doe I she would report all of the conversation to Pat Rice.

166.    Soon thereafter, an action plan was created for Sloan and he left Select for a short period and was instructed to not be involved with financials.

167.    Pat Rice, President of Select, and Bob Breighner, Vice President, Compliance and Audit Services and Relator Doe I put together the action plan in May 2011.  Admissions would be rotated.  Sloan would not always be the admitting doc.

168.    Select Medical managers took the position that there was justification in the charts for the treatment of the two patients but internally they expressed concern that these incidents not be discovered.

169.    Select Medical took the position that the results of the internal audit showed documentation in the file for the two patients and that they would not make any voluntary disclosure.

170.    In August 2011, Sloan returned and resumed directing all of the admissions to himself.

171.    In early 2012, the surgery group called and said that they wanted all of their referrals to go to Sloan or his partner, Dr. Bhasin.  Doe I said if this happens that all of the family practice physicians led by Dr. Perkins might pull out.  Dr. Sloan told Doe I he knows that might happen but "we have to do what is best for the business.  You need to go to the head of Surgical Associates and get it in writing to protect us. "

172.    Relator Doe I and Julie Hate, Director of Business Development, met with Bill Hammond, CEO of Surgical Associates, to ask him if he really wanted all of his referrals directed to Dr. Sloan.  Hammond said that the surgeon's group would not put that in writing, but that he would tell the surgeons to state their preference at the time of referral.

173.     Soon thereafter, it became clear that all of the EPIC physicians and the surgeons were referring to Drs. Sloan and Bhasin.

174.     By late Jan or early Feb 2012, Drs. Sloan and Gade told Relator Doe I, "Doe I, at some point we have to do what is best for the business.  Family practice is going to have to go."

175.     Soon thereafter, Pat Rice visited Relator Doe I and said that the EPIC physicians and surgeons want Dr. Sloan to control admissions and "we have to do what is best for the business."  Rice instructed Relator Doe I that "we need to sit down with Chad Perkins, (Medical Director and head of Family Practice Group) and tell him that we are going in a different direction.  We have to feed those that feed us. Family practice doesn't give us many referrals. We need to take care of Sloan."

176.     Pat Rice also used that visit to go over expenses to see if any more money could be squeezed out of the budget to give the EPIC physicians a distribution check.  Doe I told Rice that the recommended cuts for elimination of some positions would affect the care at Select Specialty and that they would be below the benchmark for nursing staff.

177.     Nonetheless, soon thereafter Sloan returned to Select and resumed managing patients to manipulate Length of Stays to maximize DRG reimbursement.  Sloan pushed for the case managers to follow his direction and pushed for Doe III's termination because Doe III had openly opposed his conduct.  Relator Doe III eventually left Select for anything other than temporary work.

178.     Despite Select Medical's promises to staff at Select Specialty that Sloan would be kept away from financials, when Sloan returned to Select Specialty in 2011 he was allowed access to the financial information on each patient maintained by case managers and has continued this illegal conduct described herein, with full knowledge of Select Medical corporate managers including Joe Gordon and Pat Rice.

179.     Meanwhile, efforts by Relators to have Select Medical's Corporate Managers address the high number of bronchoscopies performed by Dr. Selby went unheeded.

180.     Due to repeated requests by Relators for Select Medical to address the high number of bronchoscopies and risks to patient health and safety, Select Medical's response throughout 2011 was less than robust.

181.     Relator Doe I contacted Dr. Lisa Snyder, Chief Quality Officer for Select Medical in March 2011.  Doe I required that Dr. Snyder provide Doe I with guidance and recommendations for dealing with Dr. Selby.  Dr. Snyder conducted some review of Dr. Selby's utilization rate for bronchoscopies and consulted with Dr. Jarvis, Chief Medical Officer for Select Medical.

182.     In May 2011, the decision was made by Select Medical that it was too "difficult" to remove Dr. Selby from the medical staff at Select Specialty Hospital but that the attending physician should not consult him as a pulmonologist unless it was absolutely necessary.

183.     In May 2011, Dr. Jarvis wrote to Dr. Selby to inform him that, despite his objection, he did not have privileges to perform percutaneous tracheotomies in the LTAC setting without surgical backup.

184.     In August 2011, at the Select Specialty Evansville Board Meeting, physicians and managers present discussed the "poor outcomes with pulmonary vent patients and low margins.  Those present compared Dr. Selby's outcomes, margins and procedure numbers with another pulmonologist Dr. Henry.  Physicians present protested that the poor outcomes were not caused by the physicians but by poor discharge planning.   Rice said that Select Medical was still aware that there are repeated reports of Dr. Selby's poor performance and outcomes and that, although they could not remove him from staff privileges, Dr. Sloan should stop consulting with Dr. Selby.

185.     Coming out of the August 2011 meeting, Rice directed Relator Doe I to do "report cards" on each physician and to tell them how they are performing financially and on quality outcomes and margins per discharge to "hold them accountable."  Rice also instructed Doe I that there should never be a Short Stay Outlier "unless death" of the patient occurs or an appropriate acute care transfer.  In other words, patients should be held even if ready for discharge to avoid a lower payment under the DRG.

186.     After the August 2011 meeting, Dr. Gade told Relator Doe I that Doe I had to make a tough decision about case management or Doe I's job would be in jeopardy.

187.      In September 2011, Relator Doe I wrote again to Dr. Snyder asking for guidance on how to deal with continued problems with utilization and quality for Dr. Selby. Dr. Snyder replied with a statistical analysis to show that while Dr. Selby's rates of utilization are high they are still not the highest among Select LTACs.

188.     At the initiative of Relator Doe I and Medical Director Dr. Perkins, records for procedures performed by Dr. Selby are being collected for an audit.

A.     **Defendants Knowingly Manipulated Patient Length of Stay to Maximize DRG Reimbursement**

189.     There are numerous examples of Select and Dr. Sloan manipulating patient Length of Stay to maximize DRG reimbursement.

190.     Relators possess examples of Defendants increasing a patient's Length of Stay arbitrarily to hit the 5/6 date and capture the DRG even when discharge to home or stepped down care would be more appropriate.

191.     On multiple occasions, when a Code Blue was called within Select Specialty, Sloan would stop by the administrative office to see if the patient has met their dates already and base his decision on how to respond to the case based on where the patient was with meeting their days for the DRG (or exceeding their days for the DRG).

192.    Numerous case managers, nurses and other staff complained to Relator Doe I about Sloan's conduct.

193.    Relator Doe I promptly reported incidents to Joe Gordon and asked for assistance with intervention against Sloan at Select Specialty.

194.    Gordon instructed Doe I to talk to Sloan but also not to fax incident reports to corporate headquarters for Select Medical.

195.    Manipulation of Length of Stay also includes transferring patients to acute care once they hit the maximum number of days on the LTAC DRG and then leaving them at acute care until they will bring them back to Select after a lapse of nine days.

196.    Transferring patients back to acute care by making up needs for consultations causes Medicare to pay an extra DRG at the acute care facility and then an extra DRG at Select Specialty after the patient is readmitted to Select.

197.    St. Mary's and Deaconess have both raised opposition to patients being transferred to them where inpatient admission to acute care may not be appropriate.  Relator Doe I has had to promise to present a Short Term Acute Care report to the Evansville hospitals on the issue of medical necessity for transfer and appropriateness of acute care inpatient admissions.

198.    One of the fraudulent schemes that led to the presentment of false claims for DRG reimbursement involved the manipulation of how much treatment patients received at SSH.  Defendants, principally Dr. Sloan, would both increase the patients' length of stay in order to ensure LTC-DRG payment, or improperly discharge patients, causing a second DRG payment to be made as a result of either a re-admission to SSH or a transfer to another facility.

199.    One means by which Defendants manipulate the extent of treatment was by taking actions that increased the patients' length of stay ("LOS") at SSH.  These manipulations

caused patients who would have been short-stay outliers ("SSOs") to exceed their 5/6 Date—the threshold at which a patient becomes eligible for LTC-DRG payments.

200.    Relators allege that Dr. Sloan improperly extended the LOS beyond the 5/6 Date for the following patients, among others. All claims for these patients were paid by Medicare and thus represent a sample set of false claims submitted under Defendants' scheme.

- o **Patient A** was admitted to SSH on January 5, 2011, and was discharged on April 16, 2011, upon her death, after passing her 5/6 date. Relators allege that Dr. Sloan improperly extended Patient A's LOS by convincing her family to change her code status—the protocol to be used when the patient suffers major system failure—from "Do Not Resuscitate (DNR)" to "Full Code"—meaning full efforts would be made to save her life.  After coding, Patient A did indeed linger beyond her 5/6 Date just as Dr. Sloan had intended.

- o Once Patient A exceeded the 5/6 date, Dr. Sloan made efforts to shorten her life, and thus her stay at SSH, in order save the hospital money now that DRG reimbursement had been achieved.  For example, at the end of March, Dr. Sloan attempted to take Patient A off dialysis against the family's wishes and forbid other doctors or nurses from talking to the family about Patient A's dialysis. On April 6, 2011, Dr. Sloan informed Patient A's family that in two-hours he was beginning a terminal vent removal.  A daughter of Patient A complained to Relator Doe III that it was "murder" to perform the vent removal.  Relator Doe III reported this event to Corporate Compliance.   Dr. Sloan stopped her dialysis causing Patient A's body to fill with fluid.  Eventually, Dr. Sloan turned down the oxygen settings on Patient A's ventilator, an inhumane act, and a day later turned off the oxygen, causing her death on April 16, 2011.

- o **Patient B** was admitted to SSH on September 16, 2011, and ultimately discharged on October 19, 2011, after exceeding her 5/6 date.  Relators allege that Dr. Sloan improperly extended Patient B's LOS by sending her to an acute care hospital, St. Mary's Medical Center ("SMMC"), for an unnecessary procedure.  The intent was to hold her out for nine days before return to SSH to meet DRG.

- o By September 26, 2011, Patient B had been removed from the ventilator, had her tracheotomy removed and begun therapy.  Because of this rapid progress Relator Doe III told Dr. Sloan that Patient B would be a SSO as she would not reach her 5/6 date.  Dr. Sloan's response was to send Patient B to SMMC for a bone scan of her ankle and a cardiology evaluation.  These procedures were unnecessary. Nonetheless Dr. Sloan still discharged Patient B on October 5, 2011, for an inpatient admission to SNNC temporary admission at SMMC.  Patient B returned

- 35 -
AMENDED COMPLAINT

and she came back to SSH before nine days and that extended her stay at SSH to meet the 5/6 date.  No fracture or cardiology concern was found while Patient B was at SMMC.  Patient B was then discharged from SSH for the last time on October 19, 2011, after the 5/6 date passed.

201.    Relators allege that Dr. Sloan attempted to extend the LOS beyond the 5/6 Date for the following patients, but was unsuccessful.  These patients are examples not of false claims, but of Dr. Sloan's intent to manipulate LOS even when he was not the primary doctor for the patient.

- o **Patient C** was admitted to SSH on October 20, 2009, and was discharged only ten days later, on October 30, 2009, before reaching her 5/6 date.  Relators allege that Dr. Sloan attempted to extend LOS by stopping an order to evaluate the patient for discharge.  On October 26, 2009, Dr. Craig Haseman of SSH's Family Practice ordered that Patient C be evaluated for hospice care, which would eventuate her discharge from SSH.  Dr. Sloan stopped the order and insisted that Patient C and her family consider two more weeks of dialysis.  Relators allege that Dr. Sloan's reason for wanting to extend Patient C's LOS for two more weeks was to reach the 5/6 date.  Dr. Sloan's efforts were ultimately futile; Patient C refused dialysis on October 30, 2009, and Dr. Haseman re-ordered the evaluation for hospice.  Patient C was discharged the same day, before her 5/6 date.

- o **Patient D** was admitted to SSH in 2010.  Patient D began to experience severe distress on August 19, 2010 and a rapid response team assembled in her room. This team included Dr. Sloan, Case Manager Cheryl (last name unknown), several nurses, two respiratory therapists and a pharmacist. During this meeting, and in front of Patient D, Dr. Sloan repeatedly asked Cheryl to tell him the patient's 5/6 date and the plan for meeting it.  Cheryl informed Dr. Sloan Patient D had exhausted her Medicare coverage and thus there was no 5/6 date.  According to a summary of the event, the rapid response team reacted negatively to Dr. Sloan's questions about the 5/6 date.  They expressed disbelief that Dr. Sloan would ask those questions publicly and concern for the ethical policies of SSH.

**B.**    **Defendants Knowingly Discharge Patients Improperly & Causing An Extra DRG Payment**

202.    Another means by which Defendants manipulated the extent of treatment was by causing a second admission either at SSH or at an acute care hospital, which resulted in an unnecessary DRG payment.

203.    Relators allege that Dr. Sloan unnecessarily discharged the following patients, among others, to an acute care hospital after they had exceeded their 5/6 date.  These patients were then held in the acute care facilities until 9 days had passed.  Under the Interrupted Stay rules, if a patient is discharged from an LTCH to an acute care hospital and readmitted after 9 days, then the readmission qualifies for a second LTC-DRG payment.  The Relators allege that Dr. Sloan discharged the following patients with the intention of having them returned after 9 days so that SSH could capture the second DRG payment.  Relator Doe III was told by an SSH employee that when he takes patients to acute care hospitals he hears comments like: "Let me guess.  They've reached their time. See ya' back in 9 days." These patients represent a sample set of false claims submitted under Defendants' scheme.

- o  **Patient E** was admitted to SSH on September 22, 2010, under DRG 207, "Respiratory Diagnosis with Ventilator Support 96+ Hours."  This DRG meant she would pass her 5/6 Date after 28 days; Patient E initially stayed 37 days at SSH, until she was discharged to Deaconess Hospital on October 29, 2010.  Dr. Sloan discharged Patient E for Continuous Renal Replacement Therapy ("CRRT"), which was only offered at an acute care setting like Deaconess.  Patient E stopped receiving CRRT on October 31, 2010, within 3 days of her discharge from SSH.  Patient E did not, however, immediately return to SSH when the CRRT treatments ended.  She stayed at Deaconess until November 11, 2010, when she was re-admitted to SSH.  Under the Interrupted Stay rules, SSH was eligible for a new LTC-DRG payment for Patient E because her readmission to the LTCH occurred more than 9 days after her original discharge.

- o  Relators allege that the original discharge for CRRT was unnecessary, and that Patient E should have remained at SSH under one LTC-DRG payment.  During discharge, it was noted by a Deaconess employee that a Select liaison had asked "When can we take her back?"

- o  **Patient F** was admitted to SSH on December 16, 2008, and then discharged on February 13, 2009, after exceeding his 5/6 date.  Dr. Sloan discharged Patient F to

- 37 -

AMENDED COMPLAINT

Deaconess Hospital for a full neurological evaluation because of "mental status difficulties." Deaconess referred Patient F back to SSH on February 25, 2009, more than 9 days after his original discharge, meaning the readmission qualified for a second DRG payment. Relators allege that the original discharge for an impatient admission at Deaconess and that Patient F should have remained at SSH under one LTC-DRG payment.

204.    Relators allege that Dr. Sloan improperly discharged the following Medicare

patients, among others, and thus caused an unnecessary DRG payment to be made at the acute

care hospital, or in one case, the nursing facility, where the patients were readmitted. These

patients represent a sample set of false claims submitted under Defendants' scheme.

o   **Patient G** was admitted to SSH on September 14, 2011, and was discharged on October 4, 2011. Her total LOS was 20 days, but she surpassed her 5/6 date after 18.8 days. Relators allege that Dr. Sloan unnecessarily discharged Patient G to Deaconess, an acute care hospital, right after she exceeded her 5/6 date to save the hospital money on costs because the full LTC-DRG payment had been realized. This improper discharge caused an unnecessary, additional DRG payment to be made at the acute care hospital.

o   Dr. Sloan's reason for discharging Patient G to Deaconess was her elevated white blood cell count. Relators allege that discharge and admission to acute care was unnecessary. Patient G's white blood cell count had been improving and was lower than the levels of other patients who remained in SSH's care.

o   **Patient H** was discharged after she had hit her 5/6 date on April 18, 2011, to an acute care hospital, SMMC, to have a PermCath, a catheter used in hemodialysis, inserted.

o   **Patient I** was discharged after he had hit his 5/6 date because he was a High Cost Outlier.

o   **Patient J** was admitted on December 17, 2008, and discharged to SMMC on February 4, 2009, after he had exceeded his 5/6 date. Relator's allege his discharge was improper and incurred an unnecessary DRG payment at SSMC. Dr. Sloan's reason for discharge was that the Patient J needed CRRT, which is not offered at SSH. Relators allege that Patient J did not need to be discharged for these reasons and that Dr. Sloan's true motivation for discharging Patient J was that the 5/6 date had been reached and there was no more financial advantage to keeping him at SSH. They note that Patient J's edema had been improving and that he still needed to be slowly weaned from the ventilator, which counter-indicated discharge.

{00011690; 1}                                  AMENDED COMPLAINT

o **Patient K** was admitted to SSH on October 12, 2011, and was discharged on November 7, 2011.  She had been admitted for DRG 264, "Other Circulatory Systems O.R. Procedures," which gave her a 5/6 date of 25.1 days.  Patient K was discharged after 26 days. Patient K still required care, and she was admitted to SMMC on November 8, 2011, just after she left SSH.  Relators allege that Patient K should not have discharged from SSH in the first place, and the second DRG payment for the admission at SMMC was unnecessary.

o This allegation is supported by an email sent to Relator Doe I on November 11, 2011, by Janet Raiser, the Executive Director of Case Management at SMMC.  Ms. Raiser told Relator Doe I that SSH needed to reevaluate Patient K's file because one of SMMC's doctors of Nephrology, Dr. Richard D'Mello, had "charted things that you need to review." This implied that Ms. Raiser and Dr. D'Mello both questioned Dr. Sloan's discharge of Patient K.

o **Patient L** was discharged from SSH, but then, within 1 to 2 days, was admitted to SSMC because his wife was having a scheduled open heart surgery and was not available to take care of him. Relators allege that Patient L was improperly discharged by nephrology and that led to an inpatient admission at SSMC.  SSMC suggested that they found the discharge of Patient L objectionable because of the proximity to the wife's surgery.  Relators agree that Patient L still needed long-term care and that he should not have been discharged from SSH. They allege that Dr. Sloan disregarded Patient L's well-being and discharged him to save money because he had exceeded his 5/6 date.

o **Patient M** was admitted to on July 15, 2011, and then transferred by Dr. Sloan to SMMC on September 6, 2011, because she would be a High Cost Outlier.  Ms. Raiser of SMMC implied to Relator Doe I that she believed the transfer to her facility was financially motivated.  On October 19, 2011, Ms. Raiser sent Relator an email stating that: "You [SSH] sent us this patient [Patient L] but are denying return . . . can you check into this as I am hoping it is not because she was out of days, etc."

o **Patient N** was admitted to SSH on January 13, 2012.  On January 26, 2012, Dr. Santiago Arruffat, a colon-rectal surgeon at SSH, ordered a metastatic workup and carcinoembryonic antigen level for Patient N because a large neoplastic mass had been found.  These tests were never performed at SSH because Patient had reached his 5/6 date and had been discharged by Dr. Sloan.  He was admitted to a nursing facility where one of the Relators told him that he likely had colon cancer. Relators allege that Patient N should not have been discharged to the nursing facility, but should have remained at SSH for an oncology evaluation.

C.   **Dr. Selby Performed Unnecessary Bronchoscopies with Full Knowledge of Select Medical**

205.   Relators allege based on a review of patient records and discussions with other physicians that Dr. Jeffrey Selby performs an excessively high number of bronchoscopies on patients at Select Specialty Hospital.

206.   Two other pulmonologists, Dr. Sensarma and Dr. Henry, have strongly opposed Dr. Selby doing procedures on their patients.

207.   Dr. Selby averages 75-95 bronchoscopies per year at Select Specialty.

208.   By comparison, five other pulmonologists performed 13 bronchoscopies in 2007 and 15 in 2006.

209.   Selby schedules bronchoscopies on patients who are due to be discharged to home.

210.   Dr. Sloan will back Dr. Selby against any attempts to address Selby's overutilization.

211.   In early 2012, Relator Doe I and Dr. Chad Perkins began to conduct an audit of all of the bronchoscopies at the facility over the past four years (approximately 300-400).

212.   Relator Doe I and Dr. Perkins have raised their concerns about Dr. Selby performing unnecessary bronchoscopies with Select Medical managers and Corporate has taken the position that because Selby's utilization is not the highest of all of its facilities for pulmonologists, that there is not a problem.

213.     Relators allege that SSH pulmonologist Dr. Jeffrey Selby performed

unnecessary and unsafe bronchoscopies on the following Medicare patients, among others.

o   **Patient Y** had a bronchoscopy on February 10, 2012, performed by Dr. Selby.  Her
    previous pulmonologist, Dr. Sugata Sensarma, believed that Patient Y's tracheotomy was
    too small for a bronchoscope and postponed the procedure until after the size of the
    opening could be increased.  After Dr. Sensarma was removed from the case, Dr. Selby
    performed the bronchoscopy without waiting for the tracheotomy to be widened. Patient
    Y died on February 11, 2012, the day after the bronchoscopy.  A partially blocked airway
    is a counter-indication for bronchoscopy.

o   Dr. Sloan played a role in having Dr. Sensarma removed from the case.  Originally,
    Patient Y's surgeon, Dr. Doron Finn, had requested that Dr. Sensarma be removed and
    Dr. Selby be assigned.  Relator Doe I told Dr. Sloan that Patient Y's attending physician,
    and the patient herself, opposed Dr. Sensarma's removal.  Dr. Sloan insisted that Dr.
    Sensarma be removed in order to "keep the surgeon happy."  He further stated, "This is
    why I like to be on all the cases.  So I can control what happens."

o   There was a Medical Executive Meeting on March 7, 2012, to discuss Dr. Selby's
    dangerous practices and the death of Patient Y, among others.  One other patient
    discussed at this time was Patient Z.  Patient Z received a bronchoscopy from Dr. Selby
    on March 1, 2012.  He became pulseless during the procedure and the Procedure Nurse,
    Shelly Jordan, attempted to call a Code Blue.  Dr. Selby insisted that no code be called
    because he was still bed-side.  Eventually, Jacqueline K. Lockridge, the House
    Supervisor at the time, called the code.  Patient Z died within 24 hours.  Patient Z's
    bronchoscopy may have been medically appropriate, but his death highlights the patient
    safety concerns surrounding Dr. Selby.

o   At the March 7th meeting, both Relator Doe I and SSH CMO, Dr. Chad Perkins,
    emphasized that they had, on several previous occasions, discussed with Dr. Selby the
    concerns surrounding his bronchoscopies.  It was decided that another pulmonologist, Dr.
    Jarvis, would review Dr. Selby's bronchoscopy case files.

o   At the end of the March 7th meeting, Dr. Christopher Haughn, Quality Program Director,
    demanded that the notes of the meeting be destroyed.

o   **Patient AA** received a bronchoscopy on May 27, 2010, from Dr. Selby.  Relators allege
    that the procedure was medically unnecessary because two days prior to the
    bronchoscopy Patient AA had chest x-ray that indicated that the conditions and features
    of his lungs were "mild," "improving," "stable," or "normal."  The chest x-ray indicates
    that an invasive bronchoscopy was not medically justifiable.

- 41 -

D.     **Defendants Knowingly Submitted DRG Upcoded Claims**

214.    Relators allege that Dr. Sloan falsely coded the diagnoses of the following Medicare patients, among others, in order to increase DRG reimbursement.  These patients are a sample set of false claims that resulted from Defendants' scheme.

| PATIENT | DATE(S) OF SERVICE | FALSE CODE | EVIDENCE of INAPPROPRIATENESS |
|---|---|---|---|
| **Patient O** | **Admission** on April 26, 2010 | **Respiratory Failure** (with hypoxia, acute and chronic obstructive airway disease) | **Respiratory Assessment on April 26 (date of admission) revealed**:<br>➢ Patient comfortable<br>➢ Only prescribed medication; not oxygen as would be expected for respiratory failure<br>➢ Patient blood oxygen level was 93% on room air, too high for respiratory failure with hypoxia |
| **Patient P** | **Admission** on June 18, 2010 | **Acute Respiratory Failure** (with underlying bronchiectasis) | **Sloan's Admission Record revealed**:<br>➢ Patient only needed supplemental oxygen through a nasal cannula and not regular ventilated oxygen as would be expected for respiratory failure |
| **Patient Q** | **Admission** on December 16, 2009 | **Acute Respiratory Failure** (with acute and chronic obstructive airways disease or "COPD") | **Respiratory Therapy Care Plan of December 16 (date of admission) revealed**:<br>➢ Only recommended 1 LPM (liter per minute) of oxygen to achieve 93% blood oxygen level |

| | | | |
|---|---|---|---|
| | | | **Dr. Daniel Henry's Pulmonary Evaluation on December 17 revealed**:<br>➤ No pulmonary services had been provided at Deaconess—patient's transfer hospital<br>➤ Final impression was that patient had chronic, not acute, COPD; no mention of respiratory failure |
| **Patient R** | **Admission** on February 3, 2010 | **Respiratory failure** (secondary to acute exacerbation of obstructive airway disease) | **Respiratory Therapy Care Plan of December 16 revealed**:<br>➤ Only recommended 2 LPM N/C of oxygen to achieve 93% blood oxygen level; |
| **Patient S** | **Admission** on March 10, 2011<br><br>**Discharge** on April 7, 2011 | **Acute Respiratory failure--51881** | **Respiratory Therapy Care Plan of March 19 revealed**:<br>➤ Only recommended FiO2 of oxygen to achieve 95% blood oxygen level; |
| **Patient T** | **Admission** on April 1, 2010 | **Respiratory Failure** (underlying pulmonary edema, with atelectasis and possible plugging) | **Respiratory Therapy Care Plan of April 1 (date of admission) revealed**:<br>➤ Only recommended 2 LPM N/C of oxygen to achieve 93% blood oxygen level;<br><br>**Dr. Selby's Pulmonary Evaluation on April 2 revealed**:<br>➤ No wheezes or rales as would be expected |

| | | | |
|---|---|---|---|
| | | | <ul><li>of respiratory failure</li><li>Past history indicated only respiratory insufficiency, not failure</li><li>Final prognosis was patient's degenerative disease would "lead to respiratory failure at some point," indicating that it had not yet occurred</li></ul> |
| **Patient U** | **Admission** on April 23, 2010 | **Acute Respiratory Failure** (with acute and chronic obstructive airways disease or "COPD") | **Dr. Daniel Henry's Pulmonary Evaluation on April 24 revealed**:<ul><li>Only evaluated for COPD; did not consider respiratory failure;</li><li>No wheezes or rales as would be expected of respiratory failure</li><li>Patient had not received oxygen in 6 months; would expect current oxygen treatment with acute respiratory failure</li></ul> |
| **Patient V** | **Admission** on April 7, 2010 | **Acute Respiratory Failure** (with acute exacerbation of restrictive airway disease) | **Dr. Daniel Henry's Pulmonary Evaluation on April 11 revealed**:<ul><li>Only evaluated for COPD; did not consider respiratory failure</li><li>Patient reported that his breathing had improved significantly as compared to the way he was breathing at home; he denies any acute complaint</li></ul> |

AMENDED COMPLAINT

| | | | |
|---|---|---|---|
| | | | |
| **Patient W** | **Admission** on January 28, 2011<br><br>**Discharge** on February 17, 2011 | **Acute Respiratory Failure--518.81**<br><br>**Toxic Encephalopathy—349.82** | **Respiratory Assessment on January 28 (date of admission) revealed**:<br>➢ Only prescribed medication; not oxygen as would be expected for respiratory failure<br><br>**Dr. Selby's Pulmonary Evaluation on January 31 revealed**:<br>➢ No wheezes or rales as would be expected of respiratory failure<br>➢ Similarly, chest x-ray was clear<br>➢ History indicated only pneumonia, not respiratory failure, in the previous year<br>➢ Noted: "no acute distress," which counter-indicates acute respiratory failure<br><br>**Dr. Dhingra Physical Medicine Evaluation on February10  revealed**:<br>➢ Encephalopathy is listed a reason for the consultation, but is not mentioned in neurological or |

| | | | |
|---|---|---|---|
| | | | psychiatric findings; only mild retardation, schizoaffective disorder & possible Parkinsonism is discussed |
| **Patient X** | **Admission** on March 11, 2011<br><br>**Discharge** on April 7, 2011 | **Toxic Encephalopathy— 349.82** | **Sloan's Discharge Summary & Patient Chart revealed**:<br>➢ Mentions physical therapy was performed, but no mention of an evaluation for encephalopathy |
| **Patient G** | **Admission** on September 14, 2011<br><br>**Discharge** on October 4, 2011 | **Toxic Metabolic Encephalopathy**<br><br>**Difficult-to-Control-Diabetes** | **Dr. Dhingra's Physical Medicine Evaluation on September 19 revealed**:<br>➢ Patient awake, alert, and following simple commands<br>➢ Noted: "At the present time, I do not feel that there needs to be any specific medications for encephalopathy. She is not depicting any behavior issues."<br><br>**Dr. Andrew Thieneman's Endocrinology Evaluation on September 15 revealed**:<br>➢ History of borderline blood sugars, but not of diabetes treatment<br>➢ At referring hospital patient was receiving "some sliding scale insulin with sugars greater than 150," but ultimately not much insulin<br>➢ Ultimate finding was |

AMENDED COMPLAINT

| | | | of "probable stress induced hyperglycemia," requiring only low-dose insulin |
|---|---|---|---|
| | | | |

**E.**     **Select Medical Corporate Officers Knowingly Cause Manipulation of Patient Length of Stay to Maximize DRG Reimbursement at Its Long Term Acute Care Hospitals**

215.     As described herein, all of the practices documented at Select Specialty Hospital in Evansville are also alleged to exist at other Select LTACs nationwide.

216.     Relators have all received training at Corporate headquarters and have worked directly with the top corporate managers for Select Medical for many years.

217.     Dr. Sloan's conduct of holding patients until they hit their 5/6 date, avoiding Short Stay Outliers, discharging High Cost Outliers, upcoding, and adding additional procedures are also all corporate policies for management of the LTACs to maximize profit even at the expense of patient health and safety or contrary to patient wishes.

218.     All Select employees are graded on the same criteria:  margins, avoiding Short Stay Outliers, avoiding High Cost Outliers, using the nine day transfer rule effectively Doe I was looking at the performance report and there were too many Short Stay Outliers.

**Count I**
**False Claims Act**
**31 U.S.C. §§3729(a)(1)(A)-(B) and (G)**

219.     Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 218 above as though fully set forth herein.

220.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

221.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

222.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

223.    By virtue of the acts described above, Defendants knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

224.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

225.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

226.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

### Count II
### Indiana False Claims and Whistleblower Protection Act

227.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 218 above as though fully set forth herein.

228.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

229.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

230.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, material to false and fraudulent claims submitted to the Indiana State Government.

231.     By virtue of the acts described above, Defendants knowingly concealed overpayments from the Indiana State Government and failed to remit such overpayments.

232.     The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

233.     By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

234.     Additionally, the Indiana State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.


## Count III.
## Violation of 31 U.S.C. § 3730(h)

235.     The Relators repeat and incorporate herein by reference the material allegations of paragraphs 1- 234 above.

236.     Relators engaged in lawful conduct in the furtherance of an action under § 3730.

237.     Relators were discharged, constructively discharged or otherwise discriminated against in the terms or conditions of their employment by Defendants.

238.     Defendants' discriminatory actions and conduct were motivated by Relators' conduct in furtherance of the § 3730 action.

239.     By reason of Defendants' violation of 31 U.S.C. § 3730(h), Relators have been damaged in an as yet undetermined amount.

{00011690; 1}                    AMENDED COMPLAINT

## Count IV.
## Violation of I.C. § 5-11-5.5-8

240.    The Relators repeat and incorporate herein by reference the material allegations of paragraphs 1- 239 above.

241.    Relators engaged in lawful conduct by objecting to the Defendants submitting the false claims to the State and Medicaid for payment.

242.    Relators were discharged, constructively discharged or otherwise discriminated against in the terms or conditions of their employment by Defendants.

243.    Defendants' discriminatory actions and conduct were motivated by Relators' conduct in opposition to Defendants' violation of I.C. § 5-11-5.5-2.

244.    By reason of Defendants' violation of I.C. § 5-11-5.5-8, Relators have been damaged in an as yet undetermined amount.


### PRAYER

WHEREFORE, Relators pray for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq., and IC 5-11-55.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Indiana Code IC 5-11-5.5.;

4. That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act, and Indiana Code IC 5-11-5.5;

5. As a result of Defendants' violations of 31 U.S.C. § 3730(h) and I.C. § 5-11-5.5-8, all relief necessary to make Relators whole, including without limitation, reinstatement with the same seniority status Relators would have had but for Defendants' violations, not less than two times the amount of back pay, interest on the back pay, compensatory damages for Relators' emotional distress and suffering and attorney fees and costs;

6. That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

7. That Relators recover such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: September 28, 2012

By: /s/ *Lane C. Siesky*

Lane Siesky, Attorney #21094-53
Siesky Law Firm P.C.
4424 Vogel Road, Suite 305
Evansville, IN 47715
(812) 402-7700
lane@sieskylaw.com

Attorney for Plaintiffs Relators

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 28, 2012, a copy of the foregoing pleading was filed

electronically and manually served on the following:


      Steve Hunt
      Supervising Deputy Attorney General
      Medicaid Fraud Control Unit
      8005 Castleway Drive
      Indianapolis, IN 46250
      Telephone:  (317) 915-5320
      Facsimile:  (317) 232-6523
      shunt@atg.state.in.us

      Shelese Woods
      United States Attorney's Office
      10 W. Market, Suite 2100
      Indianapolis, IN 46204
      Telephone:  (317) 226-6333
      Facsimile:  (317) 226-5027
      Shelese.woods@usdoj.gov


                     *Lane C. Siesky*
                     Lane C. Siesky

{00011690; 1}             AMENDED COMPLAINT