UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | ) | |
| TRACY  CONROY, PAMELA | ) | |
| SCHENCK, and LISA WILSON, | ) | |
| | ) | |
| Plaintiffs-Relators, | ) | |
| | ) | |
| vs. | ) | |
| | ) | 3:12-cv-00051-RLY-DML |
| SELECT MEDICAL CORPORATION; | ) | |
| SELECT SPECIALTY HOSPITAL- | ) | |
| EVANSVILLE, INC.; SELECT | ) | |
| EMPLOYMENT SERVICES, INC.; and | ) | |
| DR. RICHARD  SLOAN, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTIONS TO DISMISS**

In April 2012, Tracy Conroy, Pamela Schenck, and Lisa Wilson ("Relators")

brought this *qui tam* action against their former employer, Select Specialty Hospital-

Evansville ("Select-Evansville"); its parent company, Select Medical Corporation

("Select Medical"); a subsidiary of Select Medical, Select Employment Services, Inc.

("Select-Employment") (collectively, "Select"); and Richard Sloan, M.D. ("Dr. Sloan"),

Chief Medical Officer of Select-Evansville.  In Count I of the Second Amended

Complaint ("Complaint"), Relators allege that Select and Dr. Sloan perpetrated a scheme

to defraud Medicare in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–

3733.  Counts II through VII assert claims against Select and Dr. Sloan for unlawful

retaliation under the FCA and Indiana's statutory analogs, the Indiana False Claims Act

1

("Indiana FCA"), Ind. Code § 5-11-5.5 *et seq.*, and the Indiana Medicaid False Claims and Whistleblower Protection Act ("Medicaid FCA"), Ind. Code § 5-11-5.7 *et seq.*[1]  In June 2015, the government elected not to intervene in the lawsuit pursuant to 31 U.S.C. § 3730(b)(4)(B).

This matter comes before the court on Select's motion to dismiss Relators' Complaint pursuant to Rules 12(b)(1), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure.  Dr. Sloan separately moves to dismiss the claims against him pursuant to Rules 12(b)(6) and 9(b).[2]  For reasons set forth below, the court **GRANTS in part** and **DENIES in part** each motion.

## I.     Standard

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction.  The scope of the court's inquiry in evaluating a challenge to subject matter jurisdiction turns on the type of challenge.  *See Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009).  A facial challenge attacks the sufficiency of the allegations in the complaint as a basis for subject matter jurisdiction.  *Id.* at 443.  When evaluating a facial challenge, the court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor.  *Silha v. ACT, Inc.*, 807 F.3d 169,

---

[1] Relators name Select-Employment as a defendant only in Counts II through VII of the Complaint—the retaliation claims.  Thus, for Count I (the FCA claim, *infra* Parts III(A) and (B)) the court's reference to "Select" incorporates only Select-Medical and Select-Evansville.

[2] Select and Dr. Sloan each incorporate by reference the other's motion to dismiss.  For clarity, the court will refer to the Select defendants and Dr. Sloan collectively as "Select" unless otherwise noted.

173 (7th Cir. 2015) (citing *Apex Dig., Inc.*, 572 F.3d at 443–44).  By contrast, a factual

challenge asserts that notwithstanding a formally sufficient pleading, the court in fact has

no subject matter jurisdiction.  *Id.*  "In reviewing a factual challenge, the court may look

beyond the pleadings and view any evidence submitted to determine if subject matter

jurisdiction exists."  *Id.*

To survive a Rule 12(b)(6) challenge, the complaint must contain sufficient factual

allegations to state a claim upon which relief may be granted.  *See, e.g.*, *Hallinan v.*

*Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2015).  The

court accepts all facts in the complaint as true and views them in the light most favorable

to the plaintiff.  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010).  But because

the FCA is an anti-fraud statute, claims brought under it must satisfy the heightened

pleading requirements of Rule 9(b).  *United States ex rel. Gross v. AIDS Research All.-*

*Chi.*, 415 F.3d 601, 604 (7th Cir. 2005).  Unlike Rule 8, which requires only "enough

details about the subject-matter of the case to present a story that holds together,"

*Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010), Rule 9(b) instructs

plaintiffs to "state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b).  This heightened standard ordinarily requires allegations that

describe the "who, what, when, where, and how" of the fraud.  *United States ex rel.*

*Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009).

## II.    Background

Select-Evansville is a long-term acute care hospital ("LTCH") in Evansville,

Indiana.  (Complaint ¶ 9).  Patients admitted to LTCHs typically come from general acute

3

care hospitals and often have serious medical conditions and specialized needs, but they generally require inpatient stays that exceed the typical length of stay at a general acute care hospital. (*Id.* ¶ 8). Select-Evansville's parent company, Select Medical, owns and operates more than one hundred LTCHs in thirty states. (*Id.* ¶¶ 8–9). Select Medical also wholly owns Select-Employment, which allegedly employed Relators at some point during the period relevant to this litigation. (*Id.* ¶ 10). As early as 2006, Dr. Sloan, a nephrologist, practiced medicine at Select-Evansville and became the facility's Chief Medical Officer in August 2009. (*Id.* ¶¶ 11, 37).

Tracy Conroy began her employment at Select-Evansville as the Chief Nursing Officer from 1999 to 2001, when she accepted a promotion to Chief Executive Officer of Select-Evansville, a position she held until her termination in June 2012. (*Id.* ¶ 5; Filing No. 145-1 ("Conroy Decl.") ¶ 5). As CEO, Conroy was charged with implementing Select Medical's policies for patient admission, length of stay, and discharge. (Conroy Decl. ¶ 7).

Conroy's former employees, Pamela Schenk and Lisa Wilson, had similarly long tenures at Select-Evansville. Schenk served first as an admissions coordinator before assuming the role of case manager for eleven years until March 2012. (Complaint ¶ 6). Wilson began her employment as a staff nurse before accepting a promotion to Director of Marketing and the Director of Clinical Services. (Filing No. 145-3 ("Wilson Decl.") ¶ 5). In 2006, Wilson became the Director of Case Management and served in that role until December 2011. (*Id.*).

4

Relators' Complaint describes a system whereby the Defendants manipulated patient stays at the Select-Evansville facility to maximize Medicare reimbursements without regard to medical need.  An understanding of the alleged scheme requires a brief summary of the law governing Medicare reimbursements.

**A.     Medicare**

Medicare, a federally-funded health insurance program, generally covers the cost of reasonable and medically necessary services for persons over the age of 65, disabled persons, or persons who suffer from end stage renal disease.  *See* 42 U.S.C. § 1395c; § 1395y(a)(1).  Participating health care practitioners and providers must provide services "economically and only when, and to the extent, medically necessary."  42 U.S.C. § 1320c-5(a)(1).  Claims for excessive charges or unnecessary services rendered to patients can result in the health care provider's exclusion from the Medicare program.  42 U.S.C. § 1320a-7(b)(6).  A provider's participation, therefore, requires certification that any claims made for reimbursement comply with all Medicare requirements.  (Complaint ¶ 22).  Providers submit payment claims to Medicare using a "CMS-1500" form, which requires the provider to certify that the services rendered were "medically . . . necessary to the health of the patient."  (*Id.* ¶ 21).

Since 2002, Medicare has reimbursed LTCHs on a prospective payment system ("PPS") referred to as LTCH-PPS.  (Complaint ¶ 23).  Under this system, payment an LTCH receives on a per-patient basis generally depends on the patient's illness and corresponding diagnosis related group ("DRG").  Depending on the DRG, the hospital receives a predetermined payment based on the average cost of treating that illness

notwithstanding the duration of inpatient stay or the actual costs incurred.  (*Id.* ¶ 24); *see generally* 42 C.F.R. § 412.523(a)–(c).

The LTCH-PPS sets forth payment adjustments for certain outlier patients.  For example, when a hospital discharges a patient with a length of stay less than five-sixths of the geometric mean for that patient's DRG, the system considers this a "short-stay outlier" for which the hospital receives less than the full DRG payment.  *See* 42 C.F.R. § 412.529.  Thus, a patient stay that reaches the five-sixths date for a specific DRG means the difference between a full DRG payment and the lesser payment for a short-stay outlier.  (Complaint ¶¶ 25, 26).  Due to the fixed nature of DRG payments, profits at LTCHs suffer the longer a patient requires treatment past the five-sixths date.  (*Id.* ¶ 27).

The LTCH-PPS also contains special payment provisions that apply when a patient leaves the LTCH for another designated facility but then returns.  *See* 42 C.F.R. § 412.531.  Payment for an interrupted stay depends on the type of facility that temporarily admits the patient and the duration of the interruption.  If a patient goes to an acute care hospital, an inpatient rehabilitation facility ("IRF"), or a skilled nursing facility ("SNF") and returns to the LTCH within three days, the LTCH receives only the one DRG payment.  *Id.* § 412.531(b)(1)(ii).  By contrast, if the interruption exceeds three days, the LTCH will receive two separate DRG payments if the inpatient stay exceeds certain "fixed day periods" set for different facilities.  *See id.* § 412.531(b)(4).  For example, if a patient transfers to an acute care hospital and stays there for more than nine days before returning to the LTCH, the system considers this readmission a "new stay" that entitles the LTCH to another DRG payment.  *Id.* § 412.531(b)(4)(i).

6

## B.     The alleged schemes

Relators allege that beginning as early as 2006, they witnessed firsthand as Dr.

Sloan and Select effected a corporate-wide policy of extending or shortening patient stays

depending on where patients fell with respect to the five-sixths date.  (Complaint ¶ 37).

This alleged policy tolerated neither short stay outliers nor patients who overstayed their

welcome much past the five-sixths date.  (*See id.* ¶¶ 38, 41, 71–73).  Relators also

describe instances where Dr. Sloan transferred patients to acute care hospitals to undergo

unnecessary treatments for the sole purpose of claiming additional DRG payments under

the "interrupted stay" provisions.  (*See id.* ¶ 81).  In essence, Relators allege, the

maximization of Medicare payments—not patient wellbeing—drove medical care

decisions.

Relators allege multiple accounts of such manipulation.  (*See id.* ¶¶ 76, 81–82).

For example, the Complaint states as follows regarding "Patient C":

> Patient C, a Medicare beneficiary, was admitted to [Select-
> Evansville] on September 22, 2010, under DRG 207,
> "Respiratory Diagnosis with Ventilator Support 96+ Hours."
> This DRG meant she would pass her 5/6 date after 28 days;
> Patient C initially stayed 37 days until she was discharged to
> Deaconess Hospital on October 29, 2010.  Dr. Sloan
> discharged Patient C for Continuous Renal Replacement
> Therapy ("CRRT"), which was only offered at an acute care
> setting like Deaconess.  Dr. Sloan, [Select-Evansville], and
> Select Medical knew [this treatment was] not medically
> necessary or appropriate.  Patient C stopped receiving CRRT
> on October 31, 2010, within 3 days of her discharge.  Patient C
> did not, however, return immediately to [Select-Evansville]
> when the CRRT treatments ended.  She stayed at Deaconess
> until November 11, 2010, when she was readmitted [to Select-
> Evansville] . . . more than 9 days after her original discharge.

7

> The original discharge for CRRT was unnecessary, and Patient
> C should have remained at [Select-Evansville] under one
> [DRG] payment.   During discharge, it was noted by a
> Deaconess employee that [a Select-Evansville] liaison had
> asked, "When can we take her back?"   As a result,
> [Defendants] knowingly submitted or caused to be submitted
> false claims to the United States Government in connection
> with the care of Patient C.

(*Id.* ¶ 81(a)–(b)).  Relators also allege several instances of Defendants falsely coding, or

"up-coding," patient diagnoses to higher-paying DRGs despite the lack of supporting

medical evidence.  (*See id.* ¶ 83).  The net result of such acts, according to Relators,

amounts to Defendants knowingly submitting false claims for payment to Medicare and

thus committing fraud against the United States government.  (*Id.* ¶ 40).

Further, Relators allege that the practices of Dr. Sloan and Select-Evansville

existed company-wide by design.  Select Medical allegedly graded employees at its

hospitals nationwide on common criteria: maintaining patient census; avoiding short-stay

outliers; and discharging or transferring patients deemed "Medicare Exhaust" (i.e., when

a patient's length of stay reaches the required five-sixths threshold for a DRG payment).

(*Id.* ¶ 64).  It allegedly recruited and retained physicians, such as Dr. Sloan, who

committed to the corporate model of exhausting Medicare payments for each patient

notwithstanding medical necessity.  (*Id.* ¶ 65).  Case managers responsible for monitoring

patient care underwent corporate training on "outlier management," or, in other words,

preventing discharges prior to the five-sixths date.  (*Id.* ¶¶ 42–43).  For patients at risk of

early discharge, Select Medical trained its case managers to prescribe occupational

therapy, speech therapy, or physical therapy at the LTCH as a means of keeping patients

long enough to claim the DRG payment. (*See id.* ¶¶ 43–46). Relators allege that Select Medical not only advocated such tactics but also held its employees accountable for failure to manage patient care in ways that achieve the five-sixths goals. (*See id.* ¶¶ 42, 50–54).

### C.    Retaliation against Relators

As early as 2007, Conroy began voicing her concerns about Defendants' practices to her direct superiors, Select Medical's Chief Operating Officer, Patricia Rice, and Regional Vice President, Joe Gordon. (*Id.* ¶ 88). In 2009, Conroy began receiving complaints from her case managers and other staff at Select-Evansville about the alleged practices of Dr. Sloan, who had substantial control over discharge and admission for the majority of patients at Select-Evansville. (*Id.* ¶¶ 67, 89). In 2011, Conroy raised her concerns with Joe Gordon and again with a Select Medical Human Resources representative but to no avail. (*Id.* ¶¶ 91–92).

In May 2011, Wilson and Schenk began gathering evidence of the fraudulent practices of Dr. Sloan and Select-Evansville. (*Id.* ¶ 94). Wilson subsequently had a meeting, which she believed to be confidential, with Patricia Rice and the Director of Compliance to discuss her concerns and to present evidence of the alleged fraud. (*Id.* ¶ 94–95). Dr. Sloan allegedly learned of the accusations levied against him and the retaliation ensued. (*See id.* ¶ 96–101). Select Medical allegedly initiated unprecedented audits of case management at Select-Evansville and suddenly required Wilson and Schenk to submit weekly patient reports directly to the doctors. (*Id.* ¶¶ 97–99). Dr. Sloan also intensified his scrutiny of Wilson and Schenk, routinely inquiring about

patient discharges, DRGs, and length of stays, and then reporting them to Conroy for poor job performance. (*Id.* ¶ 100–01).

In early 2012, Conroy was informed that, as CEO of Select-Evansville, she needed to either terminate the case managers objecting to the company's business practices or find another job. (*See id.* ¶ 102). In February 2012, Select Medical placed Conroy on a 90-day performance action plan and shortly thereafter informed her that she should transfer to a different Select Medical facility. (*Id.* ¶ 105–06). Working conditions allegedly worsened for Conroy, causing her to take a leave of absence. In June 2012, Conroy was terminated. (*Id.* ¶ 108–09).

Relators Schenk and Wilson allege similar experiences following the May 2011 meeting. Schenk first raised her concerns to Conroy and then to Select Medical's Director of Case Management. (*Id.* ¶¶ 112–13). Schenk even confronted Dr. Sloan about his allegedly fraudulent practices and resulting harm caused to patients. (*Id.* ¶ 114). Schenk alleges that due to her objections, she suffered intolerable working conditions resulting in her constructive discharge in April 2012. (*See id.* ¶¶ 116, 118–23). Likewise, Wilson raised her objections to Regional Vice President Joe Gordon, Conroy, and Dr. Sloan directly, but she, too, endured retaliation resulting in her constructive discharge in March 2012. (*See id.* ¶¶ 125–32).

### D.    Procedural background

Relators filed this action under seal in April 2012, and, in June 2015, the government made its election not to intervene. Select then moved to dismiss the Complaint on grounds that (1) the FCA's public-disclosure bar requires dismissal; (2)

10

Relators failed to plead fraud with particularity; (3) Relators cannot establish that clinical determinations were "objectively false"; and (4) Relators fail to state claims for retaliation.  Dr. Sloan filed a separate motion to dismiss claims against him for (1) failure to plead fraud with particularity and (2) for failure to state a claim for retaliation under the FCA or Indiana law.  Concurrently with the filing of Relators' responses in opposition to each motion, the government filed its own opposition to dismissal under the amended public-disclosure bar.  *See* 31 U.S.C. § 3730(e)(4)(A) (2010).  That provision, the government contends, authorizes a "government veto" of any dismissal that § 3730(e)(4)(A) would otherwise mandate.  The government's opposition incited more briefing.  By agreement, the parties submitted supplemental briefs on the constitutionality of the amended public-disclosure bar as the government interprets it.[3]

## III.   Discussion

The FCA proscribes the knowing submission of false claims for payment to the federal government and makes civil penalties and treble damages available as remedies. *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 272 (7th Cir. 2016), *petition for cert. filed*, (U.S. July 27, 2016) (No. 16-131).  It imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to the government.  31 U.S.C. §

---

[3] Relators also request oral argument on the motions to dismiss (Filing No. 147).  Because the court concludes that the parties' briefs adequately inform the court of the issues, the request is **DENIED**.

3729(a)(1)(A)–(B).  The FCA also enlists the help of private persons—known as relators—to bring *qui tam* civil actions on behalf of the United States in exchange for a share in any recovery.  *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 116 (D.C. Cir. 2015); 31 U.S.C. § 3730(b)(1).

To guard against parasitic lawsuits, the FCA contains provisions that "limit *qui tam* suits to those that expose previously undiscovered fraud or provide new, helpful information to the government."  *Heath*, 791 F.3d at 116.  One such provision is the public-disclosure bar, which disqualifies *qui tam* actions based on fraud already disclosed through certain enumerated sources.  *See* 31 U.S.C. § 3730(e)(4)(A).  Prior to undergoing some alterations in 2010, the public-disclosure bar stripped courts of subject matter jurisdiction over cases based on previously disclosed information.  *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467–68, 127 S. Ct. 1397, 167 L. Ed. 2d 190 (2007).  In a 2010 amendment, Congress removed the explicit jurisdiction-removing language and thus raised doubt about whether Rule 12(b)(1) remains an appropriate basis for dismissal under § 3730(e)(4)(A).  *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 706 (7th Cir. 2014).  Moreover, as noted above, the amended provision allows the government to oppose dismissal.  *See* 31 U.S.C. § 3730(e)(4)(A) ("The court shall dismiss an action . . . unless opposed by the Government . . . .").

The parties vigorously dispute the ultimate effect of the government's new right. Relators and the government argue that the amendment made prior public disclosure a basis for dismissal under Rule 12(b)(6), rather than a bar on jurisdiction, and has granted the government authority to veto dismissal under § 3730(e)(4)(A).  Select first contends

that the public-disclosure bar remains jurisdictional.  As such, to construe the provision as requiring the government's consent to a court's involuntary dismissal would violate separation of powers principles, the nondelegation doctrine, and due process.  In the alternative, Select claims the "government veto" runs afoul of such constitutional principles even if § 3730(e)(4) no longer limits jurisdiction.  Therefore, before turning to the sufficiency of Relators' allegations, the court must first ensure that it has subject matter jurisdiction.  This threshold question turns on (1) whether the FCA's public-disclosure bar applies to Relators' claims; if so, (2) whether Relators fall under the original-source exception; and, if not, (3) whether the amended public-disclosure bar deprives the court of jurisdiction for claims arising from post-amendment conduct. Notwithstanding the jurisdictional nature of the public-disclosure bar, the court must also evaluate the constitutionality of the government veto.

### A.      Subject matter jurisdiction

Congress added the public-disclosure bar to the FCA to avoid the "risk that unnecessary 'me too' private litigation would divert funds from the Treasury." *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012).  The pre-2010 version, enacted in 1986, provided as follows:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

13

31 U.S.C. § 3730(e)(4)(A) (2009).  In *Rockwell*, the Supreme Court held that this

version's explicit, jurisdiction-withdrawing language made clear that Congress intended

to limit the power of courts to hear certain cases.  549 U.S. at 467–68.  Thus, once

information about alleged fraud becomes public, the court has no jurisdiction unless the

Attorney General or a relator who qualifies as an original source brings the action.

*Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009).

Congress amended the FCA, effective March 23, 2010, and significantly revised

the public-disclosure bar.  The post-amendment bar provides:

> The court *shall dismiss* an action or claim under this section, *unless opposed by the Government*, if *substantially the same* allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii)  in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii)  from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2010) (emphasis added).  In addition to removing the express

jurisdictional language, the 2010 amendment grants the government an apparent right to

oppose dismissal notwithstanding the public disclosure of substantially the same

allegations.

14

Congress also revised the FCA's definition of an "original source." The 1986 version defined original source as "an individual who has direct and independent knowledge of the information on which [her] allegations are based." 31 U.S.C. § 3730(e)(4)(B) (2009). That definition proved difficult to apply in the courts, *see United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016), and Congress redefined "original source" to mean "an individual who . . . has knowledge that is independent of and materially adds to the publicly disclosed allegations . . . and who has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (2010).[4]

Notwithstanding the revisions, the Seventh Circuit continues to employ the familiar three-step inquiry to determine whether § 3730(e)(4) bars a *qui tam* action. *See Cause of Action*, 815 F.3d at 274. The court examines (1) "whether the allegations have been 'publicly disclosed' through one of the enumerated channels"; (2) if so, whether the action is "based upon" the publicly disclosed information; and (3) if it is, the court must dismiss the action unless the relator qualifies as an "original source." *Id.* At each step of the analysis, the Relators bear the burden of proof. *Id.*

---

[4] The 2010 changes to § 3730(e)(4)(A) are not retroactive and thus do not govern conduct that predates the amendment's effective date. *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 867 (7th Cir. 2011) (citing *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1, 130 S. Ct. 1396, 176 L. Ed. 2d 225 (2010)). The Seventh Circuit recently held differently with respect to the revised definition of original source under §3730(e)(4)(B). *See Bogina*, 809 F.3d at 368–69. Because the amendment clarifies rather than substantively changes the prior definition, it is "not subject to a retroactivity bar." *Id.* at 369. Even though the alleged conduct in this matter spans the 2010 amendment and would seem to call for a bifurcated analysis, such is not the case here. As the court concludes below, the government veto ends the court's public-disclosure inquiry for post-amendment conduct. Thus, if the public-disclosure bar applies, it may only preclude claims arising prior to March 23, 2010.

1.      **Public disclosure**

Under the first step, allegations are publicly disclosed "when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Id.* (citation omitted). Select cites a New York Times ("NYT") article, a press release from the United States Senate Committee on Finance, and a prior *qui tam* action against Select as prior public disclosures.[5] Relators do not challenge whether the information existed in the public domain prior to the filing of this action in April 2012, or whether the information exposed the essential elements of the alleged fraud.[6] The court therefore begins at step two of the analysis.

Step two requires a connection between a relator's claims and the public disclosure. The public-disclosure bar applies only when a relator's allegations are "based upon" the disclosure. The Seventh Circuit interprets "based upon" to mean the relator's

---

[5] Select moves the court to take judicial notice of several public documents that purportedly establish the existence of Relators' allegations in the public domain (Filing No. 143 ("Judicial Notice")). Relators do not oppose the motion. Courts may take judicial notice of public records, newspaper articles, and governmental documents not subject to reasonable dispute as to accuracy. *See Bogina v. Medline Indus., Inc.*, 11 C 05373, 2015 WL 1396190, at *3 n.7 (N.D. Ill. Mar. 24, 2015) (citing *Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012)). The court therefore **GRANTS** Select's motion.

[6] Relators briefly take issue with the NYT article because it does not specifically allege fraud. Information in the public domain need not allege fraud to trigger the public-disclosure bar so long as it discloses the "essential elements of fraud—and, consequently, provid[es] a basis for the inference that 'fraud has been committed.'" *Absher*, 764 F.3d at 708. The NYT article's allegation that Select manipulated the length of patient stays to maximize Medicare payments suffices, by itself, to give rise to an inference of fraudulent conduct. Even so, Relators do not levy this challenge against the Ohio Complaint, which expressly discloses that Select and its LTCHs had the requisite scienter.

allegations are "substantially similar" to the disclosure.[7]  *Glaser*, 570 F.3d at 920.

Although the court must caution against "viewing FCA claims at the highest level of

generality . . . in order to wipe out *qui tam* suits," the "relator must present genuinely new

and material information beyond what has been publicly disclosed."  *Cause of Action*,

815 F.3d at 281 (citations and internal quotation marks omitted).

On February 9, 2010, the NYT published an article about allegations of

questionable patient management at Select Medical's LTCHs.  The article's critique, in

part, targets one of the profit-maximizing schemes that Relators allege here.  The article

states, in relevant part:

> Select also appears to manage how long patients stay to
> maximize its profits.  A hospital is certified as a long-term care
> hospital and receives high Medicare reimbursements if most
> patients stay at least 25 days.  But Medicare pays the hospital
> a set amount for each patient, meaning that patients who stay
> longer than that become less profitable.
>
> Therefore, long-term care hospitals are most profitable if most
> patients are discharged at or just after their 25th day, with a few
> discharged earlier.  Select adheres closely to this formula, with
> an average length of stay at its hospitals of about 24 days,
> according to public filings.  At some Select hospitals, the 25th
> day is called the "magic day," ex-employees say.
>
> And in 2007, an inspector for Medicare found that a case
> manager at a Select hospital in Kansas had refused to discharge
> a patient despite the wishes of his physician and family.  The
> hospital calculated it would lose $3,853.52 if it discharged the
> patient when the family wanted, the inspector found.

---

[7] As previously noted, the 2010 amendment altered the language in § 3730(e)(4)(A), replacing "based upon" with "substantially the same."  The Seventh Circuit has since observed that the amended bar "expressly incorporates the [pre-amendment] 'substantially similar' standard" set forth in *Glaser*.  *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828 n.1 (7th Cir. 2013).

(Judicial Notice, Ex. 4 at 5).

The NYT article prompted the Senate Committee on Finance to publicly request information from Select in March 2010.  Select points to a press release from the Committee which reproduces two letters: one sent to the CEO of Select Medical and one to the Comptroller General of the United States.  The letters expressed the Committee's alarm over the allegations in the NYT article, but they do not disclose any new information.  At most, the letters merely confirm that the NYT article caught the attention of the Committee responsible for overseeing the Medicare program in the Senate.  (*See id.*, Ex. 7 at 2–8).

In September 2011, a separate *qui tam* action against Select Medical and all Select Medical-operated LTCHs, including Select-Evansville, was unsealed in the Southern District of Ohio.  Like the Relators here, the Ohio Complaint alleged that Select engaged in various schemes to defraud Medicare, including (1) the manipulation of patient length of stay to reach the five-sixths dates and thus full DRG payment; (2) the exploitation of "interrupted stay thresholds" to capture multiple DRG payments; and (3) the "up-coding" of patient DRG assignments to obtain larger payments.  (*Id.*, Ex. 1 ¶¶ 39–55).  Similarly, the Ohio Complaint also described a top-down system whereby Select Medical implemented the profit-maximizing schemes at all of its LTCHs.  (*See id.*, Ex. 1 ¶¶ 45, 50–54).

Notwithstanding the similarities at first blush, Relators argue that the public information—specifically the NYT article and the Ohio Complaint—does not contain disclosures "substantially similar" to their allegations.  In support, Relators rely on

18

*Leveski v. ITT Educational Services, Inc.*, 719 F.3d 818 (7th Cir. 2013).  In that *qui tam* action, the relator, Leveski, alleged that her former employer, ITT, knowingly submitted false claims to the Department of Education for funding from student financial assistance programs.  Specifically, she alleged a scheme whereby ITT illegally based her compensation on the number of students she brought into the for-profit institution.  *Id.* at 821–23.  The district court dismissed the action under 31 U.S.C. § 3730(e)(4)(A), finding Leveski's allegations "substantially similar" to the allegations disclosed in a prior *qui tam* action filed against ITT in Texas.  *Id.* at 827.

Reversing the dismissal, the Seventh Circuit found that the district court viewed Leveski's allegations too generally and overlooked four "critical differences" that set her complaint apart from the Texas action.  *Id.* at 829.  First, the court noted Leveski's decade-long tenure at ITT compared to the Texas relators, who spent less than two years at ITT.  Due to Leveski's longer tenure, the court reasoned, she likely possessed more relevant evidence about ITT's compensation scheme than did the Texas relators.  *Id.* Second, no temporal overlap existed between her allegations and the conduct alleged in the Texas action.  *Id.* at 829–30.  Third, Leveski's longer tenure gave her the opportunity to work in two different departments: the recruitment office—where the Texas relators worked—as well as the financial aid office.  Unlike the Texas relators, Leveski alleged how ITT tied her compensation in the financial aid office to the amount of federal aid she could secure—a totally new scheme in violation of federal law.  *Id.* at 830.  Fourth, and most critical to the court's analysis, Leveski alleged a much more sophisticated violation of federal regulations.  *Id.*  The Texas relators alleged a straightforward quota system

19

whereby compensation depended on the recruiter meeting her enrollment quotas. Leveski, however, alleged a more deceptive scheme where ITT's claimed compensation practices did not match its actual practices. *Id.* at 830–31.

Relators argue that the "critical differences" identified in *Leveski* exist here and apply with similar force. Relators specifically note their longer tenures at Select-Evansville—between thirteen and fifteen years at the hospital—and the lack of temporal overlap between their allegations and the Ohio Complaint. The Ohio relator, by contrast, worked for Select in several capacities—including as Regional Director for Provider Relations for the State of Ohio—from 1999 through 2005. (Filing 145-4 at 1). The conduct she alleges in her complaint occurred from 1995 to 2007, when she filed her lawsuit. (Judicial Notice, Ex. 1 ¶ 6). Here, the conduct Relators allege began as early as 2006 and continued until they filed suit in April 2012. Relators draw a third parallel between this case and *Leveski*: unlike the Ohio relator, who had firsthand knowledge of conduct occurring at an LTCH in Columbus, Ohio, Relators have direct knowledge of conduct occurring at Select-Evansville. Moreover, they emphasize, the allegations concerning Select Medical's corporate policies and practices stem from their personal interactions with Select personnel "at the highest corporate levels." (Filing No. 145 at 16–17).

*Leveski* does not help Relators to the extent they suggest. First, that Relators allege specific instances of fraud committed at Select-Evansville does not, by itself, set their Complaint apart from the Ohio Complaint the same way Leveski's knowledge of the financial aid office distinguished her from the Texas relators, who worked only in

20

recruitment.  The Ohio Complaint named all Select LTCHs as defendants and alleged that Select Medical implemented its fraudulent practices at all of its hospitals.  Relators make the same allegation in this case.  (*See* Complaint ¶¶ 48–49).  Likewise, although Relators' allegations span a different timeframe, this fact has much less significance here than it did in *Leveski*.  In that case, Leveski's longer tenure exposed her to a completely separate scheme in a different office than had been previously disclosed.  Furthermore, Leveski's allegations revealed that ITT engaged in "new tactics . . . to avoid the mandates of [federal law]."  The court found that Leveski's allegations far exceeded the rudimentary quota scheme alleged in the Texas action.  By contrast, Relators describe the same fraudulent schemes outlined in the Ohio Complaint.  Although Relators allege specific interactions with Select executives and claim to have a wealth of evidence— considerations the *Leveski* court found important, 719 F.3d at 829—such details merely add to the outline of fraudulent conduct previously disclosed in the public domain.  *See Cause of Action*, 815 F.3d at 281–82 ("Here, as in *Glaser*, Cause of Action's allegations pertain to the same entity . . . and describe the same allegedly fraudulent conduct . . . as the publicly disclosed information.").  Because Relators' allegations do not present "genuinely new or material information," the court finds them substantially similar to the publicly disclosed information.

### 2.    Original source

The court now must determine whether Relators may proceed as "original sources" under 31 U.S.C. § 3730(e)(4)(A).  As the court noted above, the revised definition of original source applies here.  *See supra* note 3.  To qualify, Relators must

21

have "knowledge that is independent of and materially adds to the publicly disclosed allegations and who has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B) (2010). Relators voluntarily provided information to the government before filing this action.

Relators also established that their knowledge is "independent of" publicly disclosed information. This requirement bars a relator whose knowledge "derive[s] from or depend[s] upon" the public disclosure. *Cause of Action*, 815 F.3d at 283 (quoting *United States v. Bank of Farmington*, 166 F.3d 853, 864 (7th Cir. 1999)) (alterations omitted). Rather, the relator must "have learned of the allegation or transactions independently of the public disclosure." *Id.* Here, Relators each worked for Select-Evansville for more than a decade. The vast majority of their allegations concern conduct they personally witnessed at Select-Evansville. Conroy alleges that she began voicing her concerns about the manipulation of stays as early as 2007. Even if she did not know the extent of Select's practices or whether they violated federal law until the NYT article or the Ohio Complaint became public, this does not make her knowledge any less independent. *See Leveski*, 719 F.3d at 836–37 (finding fact that Leveski did not know the value of her knowledge until speaking with a lawyer and doing independent research did not vitiate the independence of that knowledge).

Nevertheless, because the court finds Relators' allegations "substantially similar" to the allegations disclosed in the NYT article and the Ohio Complaint, their information does not "materially add[ ]" to the public disclosures. *See* 31 U.S.C. § 3730(e)(4)(B) (2010); *Cause of Action*, 815 F.3d at 283. Accordingly, for claims arising from conduct

22

that occurred prior to March 23, 2010, the amended public-disclosure bar's effective date, the court lacks subject matter jurisdiction and must dismiss.  The court must now determine whether the amended public-disclosure bar strips the court of jurisdiction for claims arising from post-amendment conduct (March 23, 2010 to April 18, 2012).

### 3.   Subject matter jurisdiction over post-amendment claims

The Seventh Circuit has not squarely addressed whether Congress's replacement of "[n]o court shall have jurisdiction" with "[t]he court shall dismiss" renders the public-disclosure bar non-jurisdictional.  In *Cause of Action*, the court left open the question but noted that other circuits that have had to decide the issue have found the new language non-jurisdictional.  815 F.3d at 271 n.5; *see also Absher*, 764 F.3d at 706 (noting that the amendment raises doubt about whether *Rockwell* remains good law, but it declined to decide the issue because the pre-amendment version applied in that case).

Select argues that although the Seventh Circuit has not directly decided the issue, the court need look no further than *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696 (7th Cir. 2015), *vacated sub nom. United States ex rel. Nelson v. Sanford-Brown, Ltd.*, 136 S. Ct. 2506 (2016), a case decided before but not mentioned in *Cause of Action*.[8]  In *Sanford-Brown*, the court considered whether the district court erred in finding it lacked

---

[8] In a single-paragraph memorandum opinion, the Supreme Court vacated *Sanford-Brown* on grounds unrelated to the public-disclosure bar, and remanded for further consideration in light of its recent decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. — , 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016).  Although the court may give precedential weight to a vacated appellate decision where the Supreme Court expresses no opinion on the underlying reasoning, *see Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1298–99 (7th Cir. 1989), *Sanford-Brown* does not consider the jurisdictional nature of the public-disclosure bar vis-à-vis the revised language and thus carries no persuasive weight here.

jurisdiction under amended § 3730(e)(4)(A) to hear claims arising from both pre- and post-amendment conduct. *Id.* at 703. The parties in that case did not dispute the jurisdictional nature of the amended public-disclosure bar; rather, they disputed whether the alleged fraud was previously disclosed, and, if so, whether the relator qualified as an "original source." *See id.* at 703–04. Nevertheless, the court, citing *Absher* and without acknowledging the revised language, stated that "the [amended] public disclosure bar is a limitation on subject matter jurisdiction." *Id.* at 703. Likewise, in *United States ex rel. Sheet Metal Workers Int'l Ass'n v. Horning Invs., LLC*, — F.3d —, 2016 WL 3632616 (7th Cir. 2016), the Seventh Circuit recently described the rule as jurisdictional—albeit citing *Rockwell*—and again made no mention of the rule's new language. *Id.* at *3. Nor did the parties in *Horning* dispute whether the public-disclosure bar still limits jurisdiction. *See id.* Thus, because the Seventh Circuit acknowledged the open issue in *Cause of Action* but has since declined to resolve it, the court turns to the decisions of other circuits for guidance.

The circuits that have considered the effect of § 3730(e)(4)(A)'s reconfiguration have found that it no longer divests courts of subject matter jurisdiction but instead serves as a basis for dismissal under Rule 12(b)(6). *See United States ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 433 (6th Cir. 2016) ("The public disclosure bar is no longer jurisdictional . . . ."), *petition for cert. filed*, (U.S. July 25, 2016) (No. 16-130); *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016) (same); *United States ex rel. Beauchamp v. Academi Training Ctr., LLC*, 816 F.3d 37, 40 (4th Cir. 2016) (same);

24

*United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) (same); *see also Ping Chen ex rel. United States v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 294 (S.D.N.Y. 2013) (same); *cf. United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 206–07 (1st Cir. 2016) (approving the district court's conclusion that § 3730(e)(4)(A) is no longer jurisdictional, but declining to definitively resolve the issue on appeal); *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1082 (8th Cir. 2014); *but see United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 n.4 (2d Cir. 2010) (describing, without analysis, the amended § 3730(e)(4) as a jurisdictional bar), *rev'd on other grounds*, 563 U.S. 401, 131 S. Ct. 1885, 179 L. Ed. 2d 825 (2011).

As the courts cited above note, the strongest clue to Congress's intent lies in the text of the rule.  The 2010 amendment "deleted the unambiguous jurisdiction-removing language previously contained in § 3730(e)(4) and replaced it with a generic, not-obviously-jurisdictional phrase ("shall dismiss")."  *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013).  The statutory context of the rule makes congressional intent even clearer.  Congress removed "jurisdiction" from the public-disclosure bar while retaining similar jurisdictional language in neighboring § 3730(e)(1) and § 3730(e)(2).[9]  *Id.*; *see also Moore*, 812 F.3d at 300; *Kucana v. Holder*, 558 U.S.

---

[9] Section 3730(e)(1) provides:

> No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

233, 249, 130 S. Ct. 827, 175 L. Ed. 2d 694 (2010) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").  The amendment also provides the government a new right to "oppose" dismissal.  As the Fourth Circuit observed in *May*, an executive opposition—whether it functions as a veto or a mere opportunity to be heard, *see infra* Section III(A)(3)(a)—makes little sense if Congress had intended the bar to remain jurisdictional, for courts cannot waive, nor may parties confer, subject matter jurisdiction.  *Id.* at 917 (citing *Gonzalez v. Thaler*, — U.S. —, 132 S. Ct. 641, 648, 181 L. Ed. 2d 619 (2012) ("Subject-matter jurisdiction can never be waived or forfeited.")); *see also Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 465 (7th Cir. 2015) (noting that parties cannot confer subject matter jurisdiction by agreement, and that a court must inquire into the existence of jurisdiction *sua sponte*).

Select notes correctly that Congress need not incant the word "jurisdiction" to make a provision jurisdictional, *see Sebelius v. Auburn Reg'l Med. Ctr.*, — U.S. —, 133 S. Ct. 817, 824, 184 L. Ed. 2d 627 (2013), but the *removal* of a jurisdictional term for

---

Section 3730(e)(2)(A) provides:

> No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

not-clearly-jurisdictional language effects a different meaning. *Advocates for Basic Legal Equal., Inc.*, 816 F.3d at 433. This conclusion finds support in the Supreme Court's recent decisions attempting "to bring some discipline to the use of [the] term [jurisdiction]." *Henderson v. Shinseki*, 562 U.S. 428, 435, 131 S. Ct. 1197, 179 L. Ed. 2d 159 (2011); *Auburn Reg'l Med. Ctr.*, 133 S. Ct. at 824; *United States v. Kwai Fun Wong*, — U.S. —, 135 S. Ct. 1625, 1632, 191 L. Ed. 2d 533 (2015). The Court has repeatedly said that absent a "clear statement" from Congress, "courts should treat the [rule] as nonjurisdictional in character." *Auburn Reg'l Med. Ctr.*, 133 S. Ct. at 824; *see Kwai Fun Wong*, 135 S. Ct. at 1632.

Select also argues that the FCA's first-to-file bar—which does not contain the term "jurisdiction"—supports the view that Congress left the jurisdictional nature of § 3730(e)(4)(A) undisturbed. This provision prohibits anyone other than the government from bringing "a related action based on the facts underlying [a] pending action." 31 U.S.C. § 3730(b)(5). As Select notes, many courts historically have considered the bar to limit jurisdiction despite the absence of explicit jurisdiction-removing language. *See United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1123 (9th Cir. 2015); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 970 (6th Cir. 2005); *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1278 (10th Cir. 2004); *but see United States ex rel. Kelly v. Novartis Pharm. Corp.*, 827 F.3d 5, 12 n.9 (1st Cir. 2016) (noting that recent decisions have called into doubt whether the first-to-file rule is jurisdictional). The Seventh Circuit has not, to the court's knowledge, described the first-to-file bar as jurisdictional. The D.C. Circuit recently concluded that Congress had not expressed a

clear statement or indication that the first-to-file rule limits jurisdiction.  *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 120–21 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).  The *Heath* court observed the express jurisdiction-removing language in § 3730(e)(1) and § 3730(e)(2) and reasoned that Congress "knew how to reference jurisdiction expressly in the [FCA] if that was its purpose."  *Id.* (internal quotation marks omitted).  The court finds the D.C. Circuit's reasoning persuasive here.

Select emphasizes § 3730(e)(4)(A)'s history as a jurisdictional bar and resists such a drastic change in interpretation absent clear evidence of congressional intent.  Select cites *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 128 S. Ct. 750, 169 L. Ed. 2d 591 (2008) for the proposition that courts should not presume that Congress "worked a change in the underlying substantive law unless an intent to make such a change is clearly expressed."  552 U.S. at 136 (citations and internal quotation marks omitted).  In that case, the Supreme Court considered whether a 1948 amendment to the statute of limitations for claims filed in the Court of Federal Claims, 28 U.S.C. § 2501 (2004), rendered the statute non-jurisdictional.  *Id.* at 135.  The 1948 revision replaced "[e]very claim . . . *cognizable by* the Court of Claims" with "[e]very claim of which the . . . Court of Federal Claims *has jurisdiction*."  *Id.*  Finding no difference in meaning between the phrases and no indication in the legislative history that Congress intended a substantive revision, the Court declined to adopt a new interpretation.  *Id.* at 136.  Here, Congress replaced "[n]o court shall have jurisdiction" with "[t]he court shall dismiss."  Although both phrases contain mandatory language (i.e., "shall"), they are not interchangeable.  One speaks to the court's adjudicatory capacity; the other does not.  *See*

28

*Musacchio v. United States*, — U.S. —, 136 S. Ct. 709, 717, 193 L. Ed. 2d 639 (2016)

("Although § 3282(a) uses mandatory language, it does not expressly refer to subject-

matter jurisdiction or speak in jurisdictional terms.").

Consistent with the weight of authority, the court concludes that the amended

public-disclosure bar is not jurisdictional and therefore not a basis for dismissal pursuant

to Rule 12(b)(1).  Instead, defendants in *qui tam* actions who raise public disclosure as a

defense must move for dismissal under Rule 12(b)(6).  *See, e.g.*, *Moore*, 812 F.3d at 300.

But the inquiry does not end here.  Select argues that even if the public-disclosure bar no

longer curbs the court's jurisdiction, the rule's so-called "government veto" nonetheless

violates separation of powers principles, the nondelegation doctrine, and due process.

The court disagrees.

### 4.     The "government veto"

Select begins its constitutional attack with its own construction of the amended

bar.  Select argues that because "unless opposed by the Government" modifies the

preceding clause, "[t]he court shall dismiss," it follows that a government opposition

renders dismissal a matter of the court's discretion rather than an involuntary command

(i.e., the court no longer *must* dismiss).  Under this construction, Select contends, the

"unless opposed" language merely grants the Government an opportunity to file a

substantive response in opposition to dismissal under 31 U.S.C. § 3730(e)(4)(A).  The

court would then weigh the arguments for and against dismissal and decide for itself

whether enforcement of the bar is appropriate.  Select maintains that this construction

avoids the separation-of-powers concerns that the "government veto" construction engenders.

As Select observes, a government opposition does not compel the conclusion that the court *may not* dismiss.  Indeed, the statute says nothing about when a court *may* or *may not* dismiss.  But a void in the statutory text does not, as Select would have it, authorize the court to insert its own filler language.  *See Campbell v. Hall*, 624 F. Supp. 2d 991, 1000 (N.D. Ind. 2009) ("[A] court can only insert language into a statute if the result of the statute's plain meaning is absurd." (internal quotation marks omitted)); *see also Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 960 (9th Cir. 2016) ("[T]he court has no right to insert words and phrases, so as to incorporate in the statute a new and distinct provision." (citation and internal quotation marks omitted)).  The interpretation Select advances would require the court to read into § 3730(e)(4)(A) an additional provision instructing the court, in the event of a government opposition, to consider all arguments and decide in its discretion whether to dismiss the action.  With respect to public disclosure, Congress expressed only one directive: courts must dismiss *qui tam* claims based on public information, unless the government objects or the relator qualifies as an original source.  31 U.S.C. § 3730(e)(4)(A) (2010).  Anything else simply finds no support in the statute.[10]

---

[10] Even if the court accepted Select's interpretation, what principle would guide the court's discretion in deciding which claims survive and which ones fail when the government objects? The court no longer has the obligation to conduct a public-disclosure analysis for the purpose of confirming its jurisdiction.  And under the current version of the bar, a government opposition negates the command to dismiss publicly disclosed claims.  Absent some constitutional or statutory command, the court knows of no criteria or standard to inform any purported discretion.

### a.   Separation of powers

In support of its proposed construction, Select claims that the alternative "government veto" construction violates the separation of powers because it requires the court to share its judicial power with the executive.  Select first directs the court to 31 U.S.C. § 3730(b)(1), which provides that a *qui tam* "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."  Courts have consistently understood this provision to require the government's consent only for voluntary dismissals.  *See, e.g.*, *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 n.5 (7th Cir. 2009); *United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932, 934 (8th Cir. 2001); *Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 158 (5th Cir. 1997) ("[T]he government forthrightly acknowledges that requiring the government's consent to an involuntary dismissal would raise separation-of-powers concerns.").  Indeed, to require the government's consent to dismissal under Rule 12(b)(6), for example, *see Shaver*, 237 F.3d at 934, or pursuant to the court's inherent authority to remedy abuses to the judicial process, *see Salmeron*, 579 F.3d at 792, 797 n.5, would offend the separation of powers.  Select extends this reasoning, without support, to conclude that Congress cannot make mandatory dismissal under the public-disclosure bar contingent on whether the executive consents.  But this view incorrectly presumes that the government veto overrides an involuntary dismissal. As explained above, a court *must* dismiss an action based on public information *if* the government does not object *and* the relator does not constitute an original source.  *See* 31 U.S.C. § 3730(e)(4)(A).  This built-in condition means that the court has no authority to

31

dismiss a *qui tam* action on the basis of prior public disclosure, and therefore no power to share, when the government asserts its opposition to dismissal.  Accordingly, the court finds no separation of powers problem here.

### b.        The nondelegation doctrine

Select also challenges the government veto as an unconstitutional delegation of legislative power to the executive.  Congress may not "abdicate or transfer to others the essential legislative functions with which it is thus vested."  *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529, 55 S. Ct. 837, 79 L. Ed. 1570 (1935).  Congress's control over federal court jurisdiction arguably represents one such core legislative function.  *See United States v. Mitchell*, 18 F.3d 1355, 1360 n.7 (7th Cir. 1994); *cf. Owens v. Republic of Sudan*, 531 F.3d 884, 890–91 (D.C. Cir. 2008) (distinguishing between a delegation of authority to define conditions under which courts will have jurisdiction and delegating authority to make factual findings to satisfy those conditions).  Even when Congress may delegate decision-making authority, it must "lay down by legislative act an intelligible principle" that directs the authorized person or entity how to conform.

According to Select, the government veto runs afoul of both principles.  First, Select contends that Congress may not delegate its power to define the contours of federal court jurisdiction.  Second, even if Congress can delegate this power, the text of the public-disclosure bar contains no intelligible principle informing the government when, or under what conditions, it may invoke its veto.  Right or wrong, both arguments

32

rely on the false premise that amended § 3730(e)(4)(A) speaks to the court's jurisdiction. As the court concluded above, it does not.

### c.    *Due process*

Finally, Select challenges the government veto construction as a violation of the Fifth Amendment's Due Process Clause.  Due process protects "against arbitrary action of government . . . , whether the problem is the denial of fundamental procedural fairness or the exercise of governmental power without any reasonable justification." *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998) (internal citations and quotation marks omitted).  This protection extends to "civil litigants who seek recourse in the courts, either as defendants hoping to protect their property or plaintiffs attempting to redress grievances." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982).  Thus, just as a plaintiff has a protectable interest in a cause of action, a defendant has an interest in available defenses to liability.  *See id.* at 431; *see also Shvartsman v. Apfel*, 138 F.3d 1196, 1199 (7th Cir. 1998).

Select argues that Congress may not authorize the government to deprive *qui tam* defendants of a longstanding defense under the FCA without the benefit of notice and a hearing.  According to Select, an opportunity to be heard means an unimpeded opportunity to invoke the public-disclosure bar as a defense.  This view misunderstands the distinction between a recognizable property interest and the process due before the government may constitutionally deprive a person of that interest.  *See Shvartsman*, 138 F.3d at 1199 (explaining that access to adjudicatory procedures "serves to protect the

33

litigants' underlying legal claims, which are the true property interests"); *see also Nat'l Union Fire Ins. Co. v. City Sav., F.S.B.*, 28 F.3d 376, 394 (3rd Cir. 1994) (reversing district court's determination that plaintiff's affirmative defenses to counterclaim were jurisdictionally barred by statute, reasoning that such deprivation of adjudicatory process to assert statutorily conferred defenses violated due process). Select's protectable interest comes from 31 U.S.C. § 3730(e)(4)(A) (2010), which directs a court to dismiss any action or claim based on substantially the same allegations that were publicly disclosed, unless the government opposes or the relator is an original source. In amending the public-disclosure bar, Congress exercised its authority to fashion a defense to liability under the FCA as it sees fit. *See Logan*, 455 U.S. at 432 ("[T]he State remains free to create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily created causes of action altogether . . . ."). When exercising this authority, "the legislative determination provides all the process that is due." *Id.* at 433. By contrast, once Congress confers an interest—i.e., the amended public-disclosure bar—"it may not constitutionally authorize the deprivation of [that] interest . . . without appropriate procedural safeguards." *Id.* at 432. Here, Select claims to have an interest greater than that which Congress bestowed: a right to invoke the public-disclosure bar even when the government opposes dismissal. As the court has explained at length, Select's reading of the statute does not comport with the text.

Moreover, Congress created the public-disclosure bar "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294,

130 S. Ct. 1396, 176 L. Ed. 2d 25 (2010) (explaining the policy underlying the 1986 version of the bar).  As Select more or less concedes, Congress could completely eliminate the bar from the FCA without offending due process because nothing about prior public disclosure circumscribes a defendant's ability to be heard on the merits of the underlying fraud allegations.  Therefore, the government veto does not jeopardize the integrity or the fundamental fairness of the adjudicatory process.

Having determined that the government's right to veto dismissal under 31 U.S.C. § 3730(e)(4)(A) passes constitutional muster, the government's exercise of that right means the court's analysis under the public-disclosure bar ends here.  The court now turns to Select's challenge to the sufficiency of Relators' allegations.

### B.    Sufficiency of FCA claims under Rule 9(b)

Select and Dr. Sloan each move to dismiss Count I on grounds that Relators have failed to plead their FCA claims with particularity pursuant to Rule 9(b).  Because Select and Dr. Sloan advance similar arguments, the court addresses the motions together.

To plead claims under the FCA, the relator must satisfy the heightened pleading requirements under Rule 9(b) and therefore state with particularity the circumstances constituting the fraud.  Fed. R. Civ. P. 9(b).  As noted above, particularity generally requires the "who, what, when, where, and how" of the fraud—"the first paragraph of any newspaper story."  *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, — F.3d —, 2016 WL 4555648, at *4 (7th Cir. 2016) (internal quotation marks omitted). The court cautions against taking "an overly rigid view of [this] formulation" because the degree of detail required of a complaint "may vary on the facts of a given case."  *Id.*

35

(quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631
F.3d 436, 442 (7th Cir. 2011)).

The FCA proscribes the knowing submission of false or fraudulent claims to the
government for payment. *See* 31 U.S.C. § 3729(a)(1). To plead a claim under the FCA,
the relator must state with sufficient particularity "(1) that the defendant made a
statement in order to receive money from the government; (2) that the statement was
false; and (3) that the defendant knew the statement was false." *United States ex rel.
Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011). However, Relators
need not prove at the pleading stage that the statement represents an "objective
falsehood." *See Abner v. Jewish Hosp. Health Care Servs., Inc.*, No. 4:05-cv-0106, 2008
WL 3853361, at *5 (S.D. Ind. Aug. 13, 2008).

First, the court examines whether Relators state with sufficient particularity that
Select and Dr. Sloan made the alleged claims for payment to Medicare. Dr. Sloan takes
Relators to task for failing to "specify how Dr. Sloan 'knowingly caused' the [Select-
Evansville] to submit allegedly false payment requests to Medicare." (*See* Filing No. 142
at 5–8; *see also* Filing No. 152 at 11–13). This focus is misplaced. Relators need not
specify Dr. Sloan's role, if any, in the preparation or submission of "CMS-1500" forms
for payment so long as the allegations make clear that payment requires a statement or
certification that care rendered was "medically necessary"; that Dr. Sloan's conduct
knowingly resulted in Medicare claims for unnecessary care; and that Select received
Medicare payments. *See Presser*, 2016 WL 4555648, at *5 (finding it sufficient to infer
false statements were made when relator alleges that all patients receive Medicare and the

36

fraudulent practices were applied to all patients); *see also United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853–54 (7th Cir. 2009) (finding that relator need not produce invoices at pleading stage to allege with particularity that a defendant made a false statement).

Relators allege instances where Dr. Sloan, consistent with Select's corporate policy, manipulated the length of patient stays to achieve the five-sixths threshold—i.e., the "sweet spot"—and thus full DRG payments, rather than the lesser payments for short-stay outliers. (*See* Complaint ¶ 57, 76). This alleged manipulation took the form of rendering unnecessary medical care, (*id.* ¶ 76(b)), transferring patients who have reached the five-sixths date to another facility only to have them returned after the "interrupted stay threshold," (*id.* ¶ 81), and "up-coding" DRG designations, (*id.* ¶ 83). According to Relators, Dr. Sloan's practices aligned with the "outlier management" training that case managers, such as Schenk and Wilson, received from Select Medical. (*Id.* ¶¶ 43–48). Moreover, outlier management, five-sixths dates, and interrupted stay thresholds have no significance outside the Medicare context. The court finds that these allegations easily support an inference that Select Medical submitted CMS-1500 forms—which require a provider to certify compliance—to Medicare for the sample patients described in the Complaint.[11]

---

[11] To the extent Relators purport to bring a claim for conspiracy pursuant to 31 U.S.C. § 3729(a)(1)(C), the court agrees with Dr. Sloan that Relators' failure to respond to that component of the motions forfeits the claim. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

The court now must determine whether the complaint describes the allegedly fraudulent schemes in sufficient detail.  "Although a pleading need not exclude all possibility of honesty in order to give the particulars of fraud, the grounds for the plaintiff's suspicions must make the allegations plausible . . . ."  *Presser*, 2016 WL 4555648, at *6 (internal citation, quotation marks, and alterations omitted).

### 1.    Extending patient stays

The first alleged scheme involves Dr. Sloan and Select-Evansville rendering unnecessary medical care to patients who would otherwise constitute short-stay outliers. Select argues for dismissal on grounds that Relators have failed to provide at least one representative example of the alleged fraud that satisfies the who, what, where, when, and how requirements.  *See United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 878 (N.D. Ill. 2012) (noting that particularity requires at least one specific instance of the fraud alleged).  The court disagrees.

Relators describe "Patient B" as a Medicare beneficiary admitted to Select-Evansville on September 16, 2011 and discharged on October 19, 2011, after exceeding her five-sixths date.  By September 26, Patient B showed signs of rapid progress and no longer required a ventilator or a tracheotomy.  Wilson allegedly told Dr. Sloan that due to Patient B's rate of progress, she would not reach her five-sixths date.  In response, Dr. Sloan had Patient B sent to an acute care hospital to undergo a bone scan of her ankle and a cardiology evaluation, neither of which revealed any medical conditions.  Before Patient B reached the nine-day interrupted stay threshold (which would have initiated a "new stay" upon her return), she returned to Select-Evansville just in time to reach the

38

five-sixths date for her original stay.  Such manipulation, Relators allege, caused a false claim for payment to be submitted to the United States.  (Complaint ¶ 76(b)).  Contrary to Select's suggestion, Relators need not prove at this stage the clinical merits of Dr. Sloan's decision to transfer Patient B.  *See Lusby*, 570 F.3d at 854–55.  Relators have alleged sufficient facts to satisfy Rule 9(b).

### 2.     Up-coding

Select challenges the second scheme—the up-coding of DRG designations to maximize Medicare payments—on grounds that Relators failed to state the particulars of an actual claim (i.e., CMS-1500 forms) for payment.  Select relies on *United States ex rel. Gravett v. Methodist Med. Ctr. of Ill.*, 82 F. Supp. 3d 835, 842 (C.D. Ill. 2015), where the district court dismissed similar up-coding claims for failure to satisfy Rule 9(b)'s particularity requirement.  In arriving at its decision, the *Gravett* court relied on *United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) for the proposition that failure to provide the particulars of a single false claim is fatal to a claim under the FCA; but in *Crews*, the Seventh Circuit affirmed the grant of summary judgment—not a motion to dismiss.  Moreover, as *Presser* confirms, Rule 9(b) does not require that a relator allege the particulars of any document so long as the complaint gives rise to a reliable inference that a false claim was made.  2016 WL 4555648, at *5.  Thus, the court finds no merit in Select's challenge to the allegations of up-coding.

### 3.     Interrupted stays

The third scheme allegedly exploits the interrupted stay rules to obtain multiple DRG payments.  Relators allege that Dr. Sloan discharged Patient C, *see supra* Part II(B),

to an acute care hospital to undergo CRRT—an allegedly unnecessary procedure—after she exceeded her five-sixths date.[12]  Despite completing CRRT within three days of discharge from Select-Evansville, Patient C allegedly remained at the acute hospital until she exceeded the nine-day threshold to "reset the clock" for another stay—and thus another DRG payment—at Select Evansville.

Select challenges the pleading of this scheme on grounds that Relators have stated nothing about the decision of the acute care hospital to discharge Patient C back to Select-Evansville.  The court agrees.  Here, Relators have a "who" problem: they failed to sufficiently describe a connection between Dr. Sloan or Select and Patient C's discharge from the acute care hospital.  Relators allege suspicious facts—(1) Patient C's DRG designation indicated a respiratory condition, and yet Dr. Sloan sent her away for CRRT; (2) convenient timing; (3) and economic motive—but notably they stop short of alleging that either Dr. Sloan or the acute care hospital had her discharged once she exceeded the nine-day threshold.  (*See* Complaint ¶ 81(a)).  As such, Relators failed to allege this fraudulent scheme with sufficient particularity.

### 4.    Premature discharges

Finally, Relators allege that Select and Dr. Sloan discharged patients from Select-Evansville once they reached their five-sixths dates.  (Complaint ¶ 82 (Patients E through L).  In doing so, Relators allege, Select and Dr. Sloan knowingly caused the recipient

---

[12] Relators also illustrate this scheme with Patient D.  The events involving Patient D predate the 2010 amendment to the FCA's public-disclosure bar.  As the court concluded above, it lacks subject matter jurisdiction to hear claims arising from pre-amendment conduct.

facilities—acute care centers or nursing facilities—to make their own claims for payment to the government that should not have been made.  For example, Select admitted Patient E on September 14, 2011, but once she reached her five-sixths date, Dr. Sloan discharged her to an acute care hospital purportedly out of concern for her elevated white blood cell count.  Relators allege that discharge to an acute care hospital was unnecessary because Patient E's white blood cell count had been improving and was lower than that of other patients who remained at Select-Evansville.  (*Id.* ¶ 82(a)).  In other words, Patient E's white blood cell count supplied the pretext for her discharge, when in fact her discharge occurred because Dr. Sloan and Select deemed her "Medicare Exhaust."

These allegations, however, fall short of supporting an inference that false claims were made to the government.  Unlike the scheme to avoid short-stay outliers, where the alleged circumstances give rise to an inference that Select in fact made false claims to the United States, the premature discharge scheme presumes without factual support that the acute care hospital or nursing facility made actual claims for payment.  Without more, the allegations fail to describe this scheme with sufficient particularity.

For the foregoing reasons, the court GRANTS in part and DENIES in part Select and Dr. Sloan's motions to dismiss Count I.

### C.    Retaliation

Counts II through VII of the Complaint assert retaliatory discharge claims against Select and Dr. Sloan.  Counts II through IV allege retaliation under the FCA, 31 U.S.C. § 3730(h).  Counts V through VII allege retaliation under the Indiana FCA and the

Medicaid FCA.  All defendants move for dismissal of these claims for failure to state a
claim.

### 1.      Retaliation under the FCA

The FCA provides relators certain protections from retaliatory conduct.  Section
3730(h)(1) provides as follows:

> Any employee, contractor, or agent shall be entitled to all relief
> necessary to make that employee, contractor, or agent whole,
> if that employee, contractor, or agent is discharged, demoted,
> suspended, threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of
> employment because of lawful acts done by the employee,
> contractor, agent or associated others *in furtherance of an
> action under this section* or *other efforts to stop 1 or more
> violations of this subchapter.*

The rule has long protected conduct "in furtherance of an action" under the FCA.  To
claim retaliation under this language, the relator must allege conduct that "put [the]
employer on notice of potential FCA litigation."  *Halasa v. ITT Educ. Servs., Inc.*, 690
F.3d 844, 847 (7th Cir. 2012) (internal quotation marks and alteration omitted); *see
Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944–45 (7th Cir. 2002)
(finding that simply alerting employer of non-compliance or illegality does not satisfy the
"in furtherance of an action" language).  Since the 2009 addition of the "other efforts"
language, the rule protects a broader range of conduct, "such as reporting suspected
misconduct to internal supervisors."  *Halasa*, 690 F.3d at 847–48.

To state a claim for retaliation, a relator must allege that (1) she engaged in
protected conduct, (2) the employer had knowledge of such conduct, and (3) that the
discharge was motivated, at least in part, by that conduct.  *See Brandon*, 277 F.3d at 944.

42

Each relator alleges multiple accounts of raising their concerns about fraudulent billing practices and the consequent harm to patient care, (*see, e.g.*, Complaint ¶¶ 88, 90–95, 104, 110). The allegations make clear that Relators' superiors, such as Patricia Rice and Joe Gordon, had knowledge that Relators objected to what they perceived as fraudulent practices designed to maximize Medicare payments. Finally, Relators sufficiently state a connection between their opposition and the adverse treatment they experienced, ultimately resulting either in termination (Conroy) or in constructive discharge (Wilson and Schenk).

Select does not challenge whether Relators have sufficiently stated claims for retaliation under the 2009 version of § 3730(h). Rather, Select wants to hold Relators to their invocation of the pre-amendment—"in furtherance of an action"—language cited throughout the Complaint. The argument proceeds as follows: The Complaint cites the pre-amendment language rather than the "other efforts" language. Therefore, because the Complaint fails to state that Relators put Select on notice of potential FCA litigation, the Complaint fails to state a claim under § 3730(h). Nonsense. On a motion to dismiss for failure to state claim, the court evaluates whether the complaint pleads sufficient facts to state claim for relief—not whether the complaint cites the accurate legal standard. Select's motion to dismiss Counts II, III, and IV is DENIED.

### 2.    Dr. Sloan

Dr. Sloan moves to dismiss the FCA claims for retaliation against him on grounds that he does not constitute an "employer" as traditionally applied under § 3730(h). The pre-2009 version of § 3730(h) protected "employees" from retaliation by "employers"

43

and therefore did not provide for individual liability.  *See Pollak v. Bd. of Trs. of the Univ. of Ill.*, No. 99 C 710, 2004 WL 1470028, at *3 (N.D. Ill. June 30, 2004).  The amendment to § 3730(h) extended the rule's protection to "employee, contractor, or agent," and removed the term "employer."  Removal of "employer" caused some district courts to doubt whether the FCA still contemplates only employer liability for retaliation. *See Perez-Garcia v. Dominick*, No. 13 C 1357, 2014 WL 903114, at *5 (N.D. Ill. Mar. 7, 2014) (comparing cases).  The majority of courts, relying on the comprehensive analysis in *Aryai v. Forfeiture Support Assocsicates*, 25 F. Supp. 3d 376 (S.D.N.Y. 2012), take the view that amended § 3730(h) did not expand the class of potential defendants subject to liability for retaliation.  *See, e.g.*, *Perez-Garcia*, 2014 WL 903114, at *5; *United States ex rel. Sibley v. A Plus Physicians Billing Serv., Inc.*, 13 C 7733, 2015 WL 4978686, 4–5 (N.D. Ill. Aug. 20, 2015); *Russo v. Broncor, Inc.*, No. 13-cv-348, 2013 WL 7158040, at *5–6 (S.D. Ill. July 24, 2013).

As the *Aryai* court observed, the legislative history confirms Congress's express intent to expand the class of potential whistleblowers who may recover under § 3730(h). 25 F. Supp. 3d at 386 (citing H.R. Rep. No. 111-97, at 14 (2009)).  The court further reasoned that this express intent combined with Congress's silence as to any similar expansion to the class of potential defendants, rendered the expansion-by-negative-implication construction implausible.  *Id.*  Moreover, because Congress left the remedy of mandatory reinstatement undisturbed, any expansion of liability beyond "employer" would make little sense.  *Id.* at 387.  The court thus concluded that § 3730(h) does not provide a cause of action against defendants in their individual capacities.  *Id.*

Relators do not discuss *Aryai* but instead rely on *United States ex rel. Abou-Hussein v. Science Applications International Corp.*, No. 2:09-1858, 2012 WL 6892716 (D. S.C. May 3, 2012).  In a footnote, the *Abou-Hussein* court found that the removal of "employer" indicated an intent to accommodate a "broader group of potential defendants who are in employer type [sic] roles but may not technically be employers."  *Id.* at *3 n.4. That court did not explain how it arrived at its interpretation; nor do Relators attempt to defend it.  The court thus finds it unpersuasive.

In line with *Aryai* and most other courts that have considered the issue, the court finds that § 3730(h) subjects only employers to liability for retaliation and not individual supervisors.  Accordingly, the court GRANTS Dr. Sloan's motion to dismiss Counts II, III, and IV of the Complaint.

### 3.    Claims under Indiana law

Finally, Select and Dr. Sloan move to dismiss Counts V through VII for failure to state claims for relief.  Both the Indiana FCA and the Medicaid FCA expressly apply to fraud committed against the State of Indiana and the Indiana Medicaid program, respectively.  *See* Ind. Code § 5-11-5.5-2; Ind. Code § 5-11-5.7-1(a).  Like the FCA, both statutes contain anti-retaliation provisions that expressly protect whistleblowers who object to the fraudulent conduct.  *See* Ind. Code § 5-11-5.5-8(a); Ind. Code § 5-11-5.7-8(a).

Relators more or less concede that they have not alleged violations, or even suspected violations, of Indiana's anti-fraud statutes.  Nonetheless, they cite boilerplate allegations that they objected to the submission of false claims to the State, investigated

45

the fraud, reported the fraud to the State, and initiated this *qui tam* action.  (*See* Complaint ¶¶ 157, 162, 167).  According to Relators, their investigative efforts suffice to state claims for retaliation under the Indiana FCA and the Medicaid FCA.  The court disagrees.  The conclusory assertion that Relators suspected fraud and alerted authorities, without more, falls short of the notice pleading that Federal Rule of Civil Procedure 8(a) requires.  The court therefore GRANTS the motions to dismiss Counts V, VI, and VII.

## IV.    Conclusion

Consistent with this Entry, the court rules as follows: Select's Motion to Dismiss (Filing No. 139) is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, the court **GRANTS** dismissal of Count I only with respect to claims (1) arising from conduct that occurred prior to March 23, 2010; (2) claims arising from the alleged manipulation of interrupted stay thresholds; and (3) claims arising from allegedly premature discharges.  The Court further **DENIES** the motion as to Counts II, III, and IV, and **GRANTS** dismissal of Counts V, VI, and VII.

Dr. Sloan's Motion to Dismiss (Filing No. 140) is **GRANTED IN PART** and **DENIED IN PART**.  With respect to Count I, the court **GRANTS** Dr. Sloan's motion to dismiss only with respect to claims (1) arising from conduct that occurred prior to March 23, 2010; (2) claims arising from the alleged manipulation of interrupted stay thresholds; and (3) claims arising from allegedly premature discharges.  The court further **GRANTS** dismissal of Counts II through VII as against Dr. Sloan.

46

Finally, the court **GRANTS** Select's Motion for Judicial Notice (Filing No. 143) and **DENIES** Relators' Motion for Oral Argument (Filing No. 147).


**SO ORDERED** this 30th day of September 2016.


RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.

47