UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| TRACY CONROY, | ) | |
| PAMELA SCHENCK, and | ) | |
| LISA WILSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:12-cv-00051-RLY-DML |
| | ) | |
| SELECT MEDICAL CORPORATION, | ) | |
| SELECT SPECIALTY HOSPITAL- | ) | |
| EVANSVILLE, INC., | ) | |
| DR. RICHARD SLOAN, and | ) | |
| SELECT EMPLOYMENT SERVICES, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

# Order Governing Discovery

## Introduction

This is a *qui tam* case brought under the federal False Claims Act. The plaintiffs were formerly employed at a long-term acute care hospital in Evansville, Indiana operated by defendant Select Specialty Hospital-Evansville, Inc. The United States gave notice of its decision declining to intervene in June 2015, and a second amended complaint was then filed by the plaintiffs on October 19, 2015, naming as defendants (1) Select Specialty Hospital-Evansville, Inc. ("Evansville Hospital"), (2) the Chief Medical Officer of Evansville Hospital, Dr. Richard Sloan, (3) Evansville Hospital's parent corporation, Select Medical Corporation ("Select Medical"), and (4) an affiliate corporation, Select Employment Services, Inc. ("Select

Employment"), which was the plaintiffs' formal employer. The claims against Select Employment are that it unlawfully retaliated against the plaintiffs; Select Employment is not alleged to have been a part of the scheme described in the second amended complaint that Select Medical, Evansville Hospital, and Dr. Sloan defrauded the Medicare program through the submission of alleged false and fraudulent claims.

The issues before the court concern the appropriate geographic and temporal scope of discovery, and the plaintiffs' plan to use sampling data obtained in nationwide discovery to establish liability or damages or both.

The plaintiffs assert that their case is nationwide in scope and they therefore are entitled to discovery to establish alleged illegal Medicare payment claims as to every long-term acute care hospital managed or controlled by defendant Select Medical Corporation—over 100 such hospitals located in about 26 states. They assert that the temporal scope of discovery with respect to Medicare reimbursement claims does not end with the date this case was filed, but they do not propose any particular ending date. They also suggest that the court should address the use of statistical sampling for establishing liability and/or damages after some portion of discovery is undertaken. *See* Dkt. 201.

The defendants have a different view. They contend that discovery must be limited to Medicare payment claims for Evansville Hospital and that discovery about Medicare payment claims at each of the 100+ Select Medical Corporation-affiliated hospitals across the country is not justified by the nature of the claims in

this case and as a matter of proportional discovery. As to temporal limits, the defendants contend that Medicare claims after the case was filed in 2012 should not be considered part of the case. With respect to sampling, the defendants state that sampling is unnecessary and inappropriate because this case is limited to the Evansville Hospital. *See* Dkts. 199 and 203 (Select Medical and Evansville Hospital) and 200 and 202 (Dr. Sloan).

## Overview of this Case

The following overview is taken substantially, and sometimes verbatim, from the court's September 30, 2016 entry on the defendants' motion to dismiss.

**A. The Second Amended Complaint**

The plaintiffs' second amended complaint alleges that Select Medical, Evansville Hospital, and Dr. Richard Sloan perpetrated a scheme to defraud the Medicare program in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733. Evansville Hospital (and other hospitals managed or controlled by Select Medical) is a long-term acute care hospital ("LTACH"). Patients admitted to an LTACH typically come from general acute hospitals and often have serious medical conditions and needs that require inpatient stays that exceed the typical length of stay appropriate to a general acute care hospital setting.

Medicare is a federally-funded health insurance program that, in general, covers the costs of reasonable and medically necessary services for persons over the age of 65. Health care providers who participate in the Medicare program must provide services "economically and only when, and to the extent, medically

necessary." 42 U.S.C. § 1320c-5(a)(1). A provider's participation requires certification that any claims made for reimbursement comply with all Medicare requirements. The claims form to obtain reimbursement, a CMS-1500 form, requires the provider to certify that the services that were rendered and for which reimbursement is sought were "medically . . . necessary to the health of the patient." (*See* second amended complaint, ¶¶ 21-22). The FCA imposes liability on a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to the government." 31 U.S.C. § 3729(a)(1)(A)-(B).

According to the complaint, during the relevant period, Medicare reimbursed LTACHs on a prospective payment system. Under this system, an LTACH receives payment on a per-patient basis depending generally on the patient's illness and a corresponding diagnosis related group ("DRG"). Depending on the DRG, the LTACH receives a predetermined payment based on the average cost of treating that illness, no matter the actual duration of the patient's stay or the actual costs that were incurred, though payment adjustments are made for certain "outlier" patients. When an LTACH discharges a patient whose length of stay is less than five-sixths of the geometric mean for that patient's DRG, the patient is deemed a "short-stay outlier" and the LTACH receives less than the full DRG payment.

Concomitantly, an LTACH's profits will suffer the longer a patient's stay exceeds the five-sixths date. Special payment provisions apply, however, when a

4

patient leaves the LTACH for another facility but then returns to the LTACH. If the patient leaves the LTACH for another facility but then returns within three days, the LTACH receives only one DRG payment (as if the stay at the LTACH had not been interrupted). But if the interruption exceeds three days, the LTACH may receive two separate DRG payments if the stay at the other facility exceeds certain "fixed day periods" depending on the nature of the other facility (e.g., whether it was an acute care hospital, or an inpatient rehabilitation facility, or a skilled nursing facility). For example, if a patient transfers from the LTACH to an acute care hospital and stays there for more than nine days before returning to the LTACH, then the return stay is deemed a "new stay" readmission that entitles the LTACH to another DRG payment.

The plaintiffs allege that beginning as early as 2006, Dr. Sloan implemented and effected at the Evansville Hospital a corporate-wide policy devised by Select Medical to extend or shorten patient stays depending on where a patient fell with respect to the five-sixths date for his or her DRG, without regard to reasonable medical necessity. Dr. Sloan is alleged to have substantially controlled the practices of discharge and admission for the majority of patients at Evansville Hospital. Medical care decisions allegedly were driven not by the patient's wellbeing and medical necessity but by the desire to maximize Medicare payments; decisions were made to minimize both short-stay outliers and five-sixths "overstays." For example, patients who were at risk of early discharge (and thus a less than full DRG payment), allegedly were prescribed additional services that

5

were not medically necessary, such as occupational therapy, speech therapy, or physical therapy to lengthen their stay to the five-sixths date. Also, patients whose stays were substantially exceeding the five-sixths date allegedly would be discharged to an acute care hospital for treatment that was not medically necessary but that would require remaining at the hospital for a sufficiently lengthy period before re-transfer to the LTACH so that the re-admission to the LTACH would permit two DRG payments. The plaintiffs also allege that patient diagnoses were sometimes "upcoded" to a higher-paying DRG even though the medical evidence did not support that coding.

The second amended complaint alleges that the decisions made by Dr. Sloan in managing and controlling patient stays, care, and DRGs at Evansville Hospital were reflective of Select Medical company-wide policies. The plaintiffs allege that Select Medical "recruits and rewards physicians willing to manage patients with the primary goal of maximizing DRG reimbursement even at the cost of patient health and safety" (¶ 65) and that Dr. Sloan in particular was rewarded through his appointment as the Chief Medical Officer of Evansville Hospital. They allege he substantially controlled the practices of discharge and admission for the majority of patients at Evansville Hospital and his decision-making was guided by managing each patient "to the . . . optimal date for reimbursement" even when not in the best interest of the patient's medical needs. (¶¶ 67, 75, 78). Dr. Sloan is also alleged to have falsely coded diagnoses in order to increase DRG reimbursement. (¶ 83).

### B. Court's Order on Motion to Dismiss

In its order on the defendants' motion to dismiss, described in more detail in the Analysis section of this order, the court dismissed certain portions of the plaintiffs' Medicare fraud claims because they were not pleaded with particularity as required by Fed. R. Civ. P. 9(b). The court ruled that (1) the alleged scheme to render unnecessary medical care to patients who would otherwise constitute short-stay outliers was pleaded with particularity; (2) the alleged scheme to upcode DRG designations to maximize Medicare payments was pleaded with particularity; (3) the alleged scheme to exploit the interrupted stay rules to obtain multiple DRG payments was not pleaded with particularity; and (4) the alleged scheme to discharge patients prematurely once they had reached their five-sixths date was not pleaded with particularity. Schemes three and four were deficient generally because their "success" depended in part on the participation of other hospitals or nursing facilities and nothing had been alleged about the decision-making of those facilities. *See* Dkt. 163 at pp. 36-40.

And significantly, Judge Young determined in his order that the allegations in the plaintiffs' second amended complaint had been publicly disclosed,[1] that their action was based upon the publicly disclosed information, and that none of the

---

[1] Public disclosure had been made through two sources: a February 9, 2010 article in the New York Times and in a *qui tam* complaint filed in Ohio, which was unsealed in September 2011, in which the relators named as defendants Select Medical and each of its LTACHs across the country, including Evansville Hospital. *See* Dismissal Order, Dkt. 163 at pp. 15-19.

plaintiffs qualified as an original source. *See id.* at pp. 22-23. As a consequence, the court ruled it lacked subject matter jurisdiction over all claims arising from conduct that occurred before March 23, 2010, the effective date of the amendment to the False Claims Act. *Id.* He also ruled that but for the government's objection to dismissal of the remaining claims, the court would have dismissed this case in its entirety. *Id.* at 35.[2]

## Analysis

The resolution of the parties' differing views of how discovery ought to be conducted in this case—and particularly their dispute about whether it should proceed on a nationwide basis—is guided by several considerations. The first is recognition of the court's well-established discretion in managing discovery. Second, the court should consider the nature of *qui tam* litigation and its effect on discovery. Third, the court must obviously consider what the appropriate discovery is in light of the claims encompassed in the second amended complaint. Fourth, the court will consider whether the plaintiffs' request simply to do statistical sampling of nationwide data ameliorates what would otherwise be burdensome and oppressive discovery. And finally, the court will employ some of those same considerations in determining the appropriate temporal scope for discovery.

---

[2] Effective as of March 23, 2010, Congress amended the public disclosure rule and its original source exception. Congress clarified the definition of an "original source," *United States ex rel. Bogina v. Medline Industries, Inc.,* 809 F.3d 365 368-69 (7th Cir. 2016), and it prohibited a court from dismissing an action based on publicly disclosed allegations and brought by a person who is *not* an original source if the government opposes dismissal. *See* 31 U.S.C. § 3730(e)(4).

### A. The court has broad discretion in managing discovery.

As the Seventh Circuit has emphasized time and again, the district court has wide discretion with respect to discovery matters, including the settling of discovery disputes, determining the scope of discovery, and otherwise controlling the manner of discovery. *See, e.g., Thermal Design, Inc. v. American Soc'y of Heating, Refrigerating and Air-Conditioning Engrs., Inc.,* 755 F.3d 832, 839 (7th Cir. 2014) (citation and quotation omitted) ("District judges enjoy broad discretion in settling discovery disputes and in delimiting the scope of discovery in a given case."); *GCIU-Employer Retirement Fund v. Goldfarb Corp.,* 565 F.3d 1018, 1026 (7th Cir. 2009) (decisions on discovery matters are within the district court's discretion); *Brown-Bey v. United States,* 720 F.2d 467, 470-71 (7th Cir. 1983) ("[D]istrict court has wide discretion with respect to discovery matters." A court's limits on the manner and course of discovery are not reversible unless shown to have been improvident and prejudicial to a party's substantial rights.). The court's authority to control all aspects of discovery arises from several sources, including Fed. R. Civ. P. 1 (directing that the rules be construed, administered, and employed to "secure the just, speedy, and inexpensive determination of every action"); Rule 16(c)((2) (addressing pretrial conferences for the purpose of controlling and scheduling discovery under Rule 26 and Rules 29 through 37); Rule 26(b) (addressing discovery scope and limits); and Rule 26(c) (addressing protective orders).

**B. *Qui tam* cases present particular discovery considerations.**

This is not the first time the undersigned has addressed the scope of discovery in a *qui tam* case. In *McArtor v. Rolls-Royce Corp.,* 2013 WL 5348536 (S.D. Ind. Sept. 24, 2013), the court addressed the parties' competing positions on the appropriate scope of discovery. The defendant had argued that *qui tam* cases are subject to special discovery rules and discovery must be stringently limited, even to the specific examples of fraudulent claims described in the *qui tam* complaint. This court noted that some of the case law upon which the defendant relied had borrowed concepts from the FCA's original source statutory language to limit discovery (either temporally or otherwise) to those matters about which the relator had "direct" or "independent" knowledge of the fraud. *See United States ex rel. Stewart v. The Louisiana Clinic,* 2003 WL 21283944 (E.D. La. June 4, 2003) ((limiting discovery to the precise Medicaid or Medicare fraudulent billings described in the complaint because the case should be limited to the matters about which the relator had independent knowledge of the fraud); *United States ex rel. Lusby v. Rolls-Royce Corp.,* No. 1:03-cv-680-SEB-WGH (S.D. Ind. July 12, 2010) (limiting temporal scope of discovery to period that relator was employed by the defendant because that was the only time frame during which the relator could have had "direct and independent knowledge" of the substantive events).

The defendants here suggest that as a rationale for limiting discovery to the universe, geographically and temporally, of which the plaintiffs have that sort of knowledge. Some courts in *qui tam* cases have borrowed from the public

disclosure/original source provisions of the statute in determining the proper scope of discovery. But this court has rejected the notion of tying discovery to the FCA's public disclosure bar/original source exception because these statutory concepts have not been static but have been periodically amended by Congress over the years, not every *qui tam* case requires a relator to be an "original source," and the concepts were not designed as discovery principles but to affect the court's subject matter jurisdiction (pre-March 23, 2010) or, as of March 23, 2010, its decision not to dismiss a case over the government's objection. *See generally McArtor,* 2013 WL 5348536.

This litigation illustrates why it would be incongruent to use public disclosure/original source statutory concepts to regulate discovery. In its dismissal order, the court determined that none of the plaintiffs is an original source and that the case would have been dismissed in its entirety had the government not objected to dismissal of those claims arising after the post-2010 amendment to the FCA. Tying discovery to original source concerns about the relator's independent knowledge would make no sense in a case where no relator is an original source but the case was not dismissed because of the government's objection.

But this court is still convinced, as it described in *McArtor,* that "discovery must hew closely to matters specifically described in the complaint lest discovery, because of its burden and expense, become the centerpiece of litigation strategy." 2013 WL 5348536 at *7. Moreover, since *McArtor,* Federal Rule of Civil Procedure 26(b), describing the scope and limits of discovery, was amended effective December

11

1, 2015, to once again protect against over-discovery and to emphasize judicial management of the discovery process. *See Noble Roman's, Inc. v. Hattenhauer Distributing Co.,* 314 F.R.D. 304, 307-08 (S.D. Ind. 2016). The court must be especially mindful that discovery is "proportional" to the needs of a case and must protect against undue burden and expense.

The same concern about controlling discovery to some manageable level in *qui tam* cases is highlighted in various cases cited by the parties. In some of them, the courts were convinced that the case was a nationwide case and discovery was initially limited to a subset geographic area that could be widened depending on the state of proof uncovered through discovery focused on the smaller geographic subset. *See United States ex rel. Spay v. CVS Caremark Corp.,* 2013 WL 4525226 at *7 (E.D. Pa. Aug. 27, 2013) (collecting cases where limited discovery addressed to a geographic region was permitted "while reserving for a later date broader nationwide discovery. . . .") In some cases, the courts were convinced that despite a complaint's allegations about nationwide or otherwise broadly-based fraud, a fairer reading of the complaint was that it was limited to a smaller geographic area or had some other smaller focus. *See United States ex rel. Rigsby v. State Farm Fire and Casualty,* 2017 WL 2901698 at *1-2 (S.D. Miss. Apr. 12, 2017) (decision about scope of discovery after remand from Fifth Circuit to permit case to include Hurricane Katrina/National Flood Insurance Program false claims broader than the claim that was tried to a jury); *CVS Caremark,* 2013 WL 4525226 at *2-3 (E.D. Pa. Aug. 27, 2013) (limiting temporal scope to two-year period emphasized in complaint and

limiting discovery as to certain fraud claims to particular states described in the complaint); *United States ex rel. Regan v. Medtronic, Inc.,* 2000 WL 1478476 at *2-3 (D. Kan. July 13, 2000) (limiting discovery to Wichita, Kansas sales district, and rejecting assertion that nationwide discovery was appropriate under the complaint). In another case, the court determined that the claims were nationwide in scope and addressed the burden and expense of discovery through cost-sharing. *United States ex rel. Bibby v. Wells Fargo Bank, N.A.,* 165 F. Supp. 3d 1340, 1355-56 (N.D. Ga. 2015).

As discussed below, the court rejects the plaintiffs' argument that a fair reading of their complaint and Judge Young's ruling on the motion to dismiss require that they be permitted to conduct discovery on a nationwide basis rather than focusing on the Evansville facility.

### C. **The allegations of the Second Amended Complaint do not compel the conclusion that this case encompasses Medicare claims at all 100+ Select Medical facilities in the United States.**

The plaintiffs' stance on discovery proceeds from the assumption that this is a nationwide case for which they are entitled to nationwide discovery about alleged Medicare fraud at every one of the 100+ LTACHs across the country "controlled" by Select Medical. The court disagrees that this case must be treated as a nationwide Medicare fraud case.

First, Judge Young's dismissal order does not purport to rule that the case encompasses every Medicare claim at every Select Medical LTACH for which a DRG was allegedly fraudulently upcoded or unnecessary medical care was allegedly

13

rendered to avoid short-stay outliers. Judge Young made no ruling that the naming of Select Medical as a defendant means that the case involves every potentially false Medicare claim in the above categories at every Select Medical LTACH.

Second, the complaint itself does not require that conclusion. Although the plaintiffs assert that there was no reason for them to name Select Medical as a defendant unless this is a nationwide case, their second amended complaint does not support that conclusion. That complaint alleges that the Medicare fraud was perpetrated by Select Medical, Evansville Hospital *and* Dr. Sloan and that they "conspired together" to defraud the United States by knowingly making false or fraudulent claims. See Dkt. 128, ¶¶ 135-138.[3] Neither Evansville Hospital nor Dr. Sloan is alleged to have played any role with respect to any LTACH except Evansville Hospital itself. And the complaint indicates that the success of the alleged nationwide policy depended on a compliant doctor in a position such as Dr. Sloan's. The complaint does not make any specific allegations about any other specific Chief Medical Officer or other named official at any other LTACH who allegedly controlled upcoding or short-term outliers at their hospitals in a way knowingly to defraud the Medicare program.[4]

---

[3] That the plaintiffs did not defend their conspiracy allegations when the defendants moved to dismiss them does not change the fact that in Count I (their FCA false claim count), they allege that the false claims were made by Select Medical, Evansville Hospital, *and* Dr. Sloan.

[4] Further, as Dr. Sloan points out, it would be extraordinarily burdensome and expensive to him if this case were viewed as nationwide, requiring his lawyers to participate in discovery that may have nothing to do with the claims against him. It would be difficult for his counsel to make pre-determinations that all discovery

14

The most natural reading of the complaint is that it is limited to fraudulent Medicare claims for patients at Evansville Hospital. The descriptions in the complaint about Select Medical's corporate policy plausibly allege that it played a role in the submission of false or fraudulent claims for patients at Evansville Hospital. They plausibly allege that Dr. Sloan engaged in knowing misconduct because, according to the complaint, Select Medical rewarded and promoted doctors like him who were willing to make decisions for the purpose of enhancing Medicare payments at the expense of the medical necessity of particular treatment for patients at Evansville Hospital. In short, the court does not agree with the plaintiffs that their naming of Select Medical as a defendant and the complaint's description of an alleged company-wide policy geared to defrauding Medicare was wholly superfluous unless their case encompassed every potential Medicare claim at every 100+ LTACH.

The court further notes in this regard that the government's pre-intervention decision investigation focused only on the Evansville Hospital. According to the defendants, during the three-year period after the complaint was filed (and sealed) when the government conducted its pre-intervention decision investigation, the government investigated Medicare claims only for Evansville Hospital and requested patient records only from that hospital. *See* Dkt. 199 at p. 6. Furthermore, even though this case was not dismissed as to post-2010 FCA

---

not specifically concerning Evansville Hospital would have no bearing on the plaintiffs' proof of their claims against him.

15

amendment claims because of the government's objection, the government has not expressed any view about the scope of discovery. The court did not expressly invite it to make any filing regarding this issue, but the government is served with all filings in this case (*see* 31 U.S.C. § 3730(c)(3)), must approve any settlement of the case, and could have expressed its views had it taken the position that nationwide discovery is appropriate.

### D. The plaintiffs' request to conduct discovery—and to prove their case—through nationwide sampling is not an appropriate cure for oppressive, burdensome, and expensive discovery.

The plaintiffs agree that discovery into patient files and records at Select Medical's 100+ facilities would be daunting and oppressive.[5] They state that they do not propose to do such discovery "at this juncture." Instead, they want to conduct preliminary discovery about Select Medical's corporate policies and corporate database that discloses general patient information such as lengths of stays, 5/6 goal dates, and costs. Then, they say, experts could devise a statistical sampling method (for later court evaluation and approval) that would require only a random sampling of actual patient medical records for review by expert doctors. After such random sampling and doctor review, the plaintiffs expect to propose a method by which the number of fraudulent Medicare claims and the damages flowing from them could be determined without ever having to examine medical information for

---

[5] The defendants do not argue that discovery would be unduly burdensome or expensive or inappropriate in some other way if it is limited to Evansville Hospital.

16

each patient for whom the plaintiffs assert that a fraudulent Medicare claim was made.

The primary problem with discovery advancing in this manner—aside from the fact the claims plausibly alleged in the second amended complaint do not warrant it—is that it ignores what the plaintiffs would ultimately need to prove to prevail in this case. The plaintiffs cite no authority for the proposition that proving that a particular Medicare reimbursement claim was fraudulent based on a theory of lack of medical necessity can be done by a random-sampling method that does not evaluate whether each particular claim for which the plaintiffs seek relief was actually knowingly false within the meaning of the FCA. This case is about unnecessary or inappropriate medical treatment being rendered to a patient in order to maximize Medicare reimbursement.

The plaintiffs' suggestion that random sampling and statistical analysis of claims across 100+ hospitals probably will be sufficient threatens to upend the burden of proof in this case. The plaintiffs have the burden to prove *each* false claim; the defendants should not have the burden to present evidence on every claim at every hospital to show that the medical treatment and coding was appropriate and was not rendered for the purpose of inflating Medicare reimbursement, but that would be the reasonable way it could defend broad assertions of liability based on sampling. This is a fraud case that depends on whether medical care or the coding of a medical condition was appropriate, and fraud will have to be proved on a claim-by-claim basis based on the patient's actual

17

medical condition and actual medical care. Conducting discovery in a manner not focused on the ultimate burdens of proof is not appropriate.[6]

Moreover, this is not a case in which records are not available to review the medical condition and care of patients for making a determination whether medical necessity took a back seat to Medicare-payment enhancement. There is no showing of a potential evidentiary gap that is the fault of the defendants for which representative-type evidence (such as that proposed via the plaintiffs' discovery plan) would be appropriate. *See Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1046-47 (2016) (allowing the use of representative sampling to establish broader liability where the defendant had not maintained the information it was required by law to maintain that would have made representative sampling unnecessary).

The court determines, based on the allegations of the second amended complaint, the need to hew closely to those allegations in determining the proper scope of discovery so that discovery is proportional, manageable (not unduly burdensome or expensive), and consistency with the burden of proof, that discovery in this case is limited to proof that false claims were made as to patients at Evansville Hospital concerning the two types of fraud that survived dismissal and that occurred on or after March 23, 2010.

---

[6] The court focuses here on proof of and defenses to fraud. If fraud is ultimately proven, statistical evidence based on sampling could be appropriate for calculating damages, but that is not a matter that needs to be determined now.

**E. Discovery should proceed with a definite temporal scope.**

The defendants contend that the court should limit the temporal scope of this case to Medicare claims made on or after March 23, 2010, and on or before the date that the plaintiffs filed their complaint under seal (April 18, 2012). The plaintiffs argue that the filing date of their sealed complaint should not represent the outer temporal limit of their claims. They do not suggest an outer date, but state only that the end date "should be determined by the evidence." Dkt. 13 at p. 13.

The court determines that some end date must be established; otherwise, discovery would never end. It is not manageable to permit the continued discovery of patient records, experts' reviews of them, and deposition testimony about them through trial.

The date the plaintiffs filed their sealed complaint is not appropriate because the nature of the allegations is that the scheme was ongoing, and the complaint was not even served on the defendants until years after it was filed. The dates that the plaintiffs left their employment at Evansville Hospital are not an appropriate touchstone; some courts have chosen that date because it marks the end period that a relator had "direct and independent" knowledge of the alleged fraud, harkening to the original source requirement under the FCA. But as explained above, grafting original source concepts onto discovery is not appropriate and in this case, none of the relators is an original source anyway.

The court finds that an appropriate end date is the date the court entered its ruling on the defendants' motion to dismiss and established the claims that

survived Rules 12(b)(6) and 9(b). Although picking any end date is somewhat arbitrary, this end date is a proxy for establishing a reasonable period of overall time (about 6 ½ years for claims from March 23, 2010, through September 30, 2016) that is manageable for discovering information about Evansville Hospital's alleged fraudulent Medicare claims. It also marks an end point coincident with the court's ruling that the claims survived because of the government's opposition to dismissal.

## Conclusion

For the foregoing reasons, the court finds that discovery is limited to the discovery of information proportional to proof of fraudulent Medicare claims (of the type that survived dismissal) for patients at Evansville Hospital only and for the period on or after March 23, 2010, and on or before September 30, 2016.

So ORDERED.

Dated: April 2, 2018

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:
All ECF-registered counsel of record by email through the court's ECF system